

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---
### NO. AP-77,036
---

## JUAN BALDERAS, Appellant

### v.

## THE STATE OF TEXAS

---
### ON DIRECT APPEAL FROM CAUSE NO. 1412826
### IN THE 179TH DISTRICT COURT
### HARRIS COUNTY
---

KEASLER, J., delivered the opinion of the Court, in which MEYERS, HERVEY, RICHARDSON, YEARY, and NEWELL, JJ., join. KELLER, P.J., concurred in point of error three and otherwise joined. RICHARDSON, J., filed a concurring opinion, in which MEYERS, JOHNSON, and NEWELL, JJ., join. ALCALA, J., filed a dissenting opinion.

## O P I N I O N

In February 2014, a jury convicted Juan Balderas of capital murder committed in December 2005.[1] Based upon the jury's answers to the special issues set forth in Texas Code of Criminal Procedure article 37.071, sections 2(b) and 2(e), the trial judge sentenced

---

[1] TEX. PENAL CODE § 19.03(a)(2).

Balderas to death.[2]  Direct appeal to this Court is automatic.[3]  After reviewing Balderas's

nine points of error, we find them to be without merit.  Consequently, we affirm the trial

court's judgment and sentence of death.

### STATEMENT OF FACTS

In 2004, the victim, Eduardo Hernandez, became a member of the Barrio Tres Alief

("BTA"), a regional subset of the La Tercera Crips ("LTC") street gang in Houston.

Balderas, a long-time member of the LTC gang and one of the founding members of the BTA

subset, had introduced Hernandez to the gang.  Initially, the other LTC members liked

Hernandez, and Hernandez was proud to be part of the gang.  LTC member Israel Diaz

befriended Hernandez, and for a while Hernandez lived with Diaz.  However, in late 2004,

this friendship soured after Diaz let Hernandez borrow a vehicle that Diaz had stolen the

week before.  Police officers stopped and arrested Hernandez while he was driving the stolen

vehicle.  After Hernandez informed them that he had borrowed the vehicle from Diaz, they

arrested Diaz for aggravated robbery.

Diaz bonded out of jail in April 2005.  He was angry with Hernandez for "snitching"

on him.  He "lectured" Hernandez about giving his name to the police, and Hernandez

promised that he would not testify against Diaz in the aggravated robbery case.  Balderas's

defense counsel argued at trial that Hernandez's snitching gave Diaz a motive for murder,

---

[2]  TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

[3]  *Id.* at § 2(h).

but Diaz denied that he wanted to kill Hernandez. Diaz testified that he knew that two other witnesses could identify him as the thief and that police had found his fingerprints on the stolen vehicle; therefore, preventing Hernandez from testifying would not have helped him avoid the robbery conviction. Also, because of the pending robbery case, Diaz knew that he would be the first suspect if anything happened to Hernandez. Diaz testified that even though he personally did not want to kill Hernandez, other LTC members viewed Hernandez's conduct as being disrespectful of the gang and thought that Hernandez needed to be punished. Diaz testified that he asked those members to wait until his trial was over before they took action against Hernandez.

After the snitching incident, Hernandez stopped associating with other LTC gang members. He also moved out of his family home so that LTC members could not easily locate him. In August or September 2005, he began dating Karen Bardales ("Karen"). Hernandez and Karen spent much of their time "hanging out" in an apartment belonging to one of Karen's friends, Durjan Decorado, who was not in a gang. Karen's older sister, Wendy Bardales ("Wendy"), and Wendy's boyfriend, Edgar Ferrufino, also spent much of their time in that apartment. Karen and Wendy's friends, including members of several rival gangs, would visit them there. Hernandez socialized with those friends.

Over the next few months, LTC gang members heard rumors that Hernandez was associating with members of rival gangs and flashing rival gangs' hand signs, which constituted acts of disloyalty and disrespect against the LTC gang. After seeing images of

Hernandez on social media confirming these rumors, some indignant LTC members urged the gang to take action against him. Three or four days before Hernandez's killing, senior members of the gang called a meeting. Those in attendance agreed to shoot and kill Hernandez. Although they did not expressly select an individual to kill him, everyone understood that Hernandez was Balderas's responsibility because he had introduced Hernandez to the gang.

On the afternoon of December 6, 2005, Wendy, Ferrufino, Karen, and Hernandez were hanging out in Decorado's apartment. Jose Vazquez, a senior LTC gang member, stopped by to talk to Hernandez. Karen began saying disrespectful things about the LTC gang, which upset Vazquez. Vasquez wanted Hernandez to leave the apartment with him, but Hernandez refused. Hernandez was visibly upset after Vazquez left. He told Karen that he was worried that something was going to happen. Later, Hernandez left with his sister to go shopping and have dinner. He and Karen reunited at the apartment complex that night.

Around 9:45 p.m., Wendy, Ferrufino, Decorado, and Decorado's cousin were in Decorado's apartment. Ferrufino and Wendy were playing a video game in the living room. As Karen and Hernandez approached the apartment, Karen noticed fresh LTC gang graffiti on the exterior wall. Immediately after entering the apartment, they heard gunshots, and then the front door opened and a gunman ran into the apartment. Hernandez dropped to the floor and pulled Karen down with him, positioning himself between Karen and the gunman. Decorado and his cousin fled to the bedrooms, and Ferrufino crouched next to the television

stand. Wendy, who was sitting on the floor between the couch and the television, froze. She could see the gunman as he entered the apartment, and her eyes followed him until he left.

The gunman fired his gun as he ran around the living room. Wendy saw that he was wearing khaki pants and a black hoodie, with the hood pulled up over his head. She got a good look at his face when his hood fell down as he passed her. The gunman paused in front of Ferrufino, who asked him not to shoot. He did not shoot Ferrufino and began to move back toward the entryway, but then he stopped and stood over Hernandez. He shot Hernandez in the back and head multiple times. Karen, who was lying face-down next to Hernandez, did not see the gunman's face, but when the gunman extended his arm toward Hernandez, Karen could see that he was wearing a black sweater. After shooting Hernandez at least nine times, the gunman left. Ferrufino called 9-1-1.

Around that time, Diaz heard from another LTC gang member that "they" had "found [Hernandez,]" which Diaz understood to mean that Hernandez was about to be (or had just been) killed. He and other LTC members gathered across the street from the apartment complex. They could see an ambulance and police cars in the parking lot. Diaz saw Balderas waiting near the apartment complex. Balderas was wearing a dark blue or black sweater-like top and khakis. When Balderas noticed Diaz and the others, he crossed the street to join them. Balderas hugged everyone and seemed "joyful" as he reported that he "finally got him." Diaz saw Balderas change the magazine of a silver handgun. Diaz recognized the handgun as one of two silver guns that Balderas regularly carried.

That night, law enforcement officials took Wendy, Karen, and Ferrufino to the police station to give witness statements. In the early morning hours of December 7, Wendy gave a statement that was committed to writing by Officer Thomas Cunningham. Wendy stated that she had never seen the gunman before, and she described him as a "skinny Hispanic guy dressed in a black hooded sweatshirt type jacket." She also stated that he had a "dark birth mark" on his face but she could not remember where.

Around 10:30 p.m., Sergeant Norman Ruland drove to Wendy's apartment to show her a photo array of six suspects that included Diaz but not Balderas. Wendy did not identify the gunman, but she recognized Diaz. She stated that he was a friend of Hernandez who went by the street name "Cookie," and that she was sure he was not the gunman. She told Ruland that the gunman had a dark mark on his cheek that did not resemble the scars that were visible on Diaz's face.

On December 12, Ruland returned to Wendy's apartment with a second photo array that included Balderas's photograph. Wendy immediately pointed to Balderas, saying that she recognized him as a friend of Hernandez and Diaz who went by the street name "Apache." She also stated that he "looked like the shooter." When Ruland asked Wendy if Balderas was the shooter, she reiterated that Balderas's "face looked exactly like the shooter's face." She signed and dated Balderas's photograph to confirm her identification. Although Ruland felt that Wendy was confident in her identification of Balderas as the gunman, he was confused by her verbal phrasing in making the identification. Therefore, the

following day, he returned to Wendy's apartment to seek clarification. On this occasion, Wendy expressly identified Balderas as the gunman, stating that she was positive in her identification. She wrote a sentence in Spanish on the back of the lineup to confirm her positive identification. Based on this identification, police obtained a warrant for Balderas's arrest.

On December 16, Officer Rick Moreno drove to an apartment complex where he watched for Balderas and another LTC gang member, Rigalado Silder, and waited for the assistance of a SWAT team. After Moreno had been watching the complex for about 25 minutes, he observed Balderas and Silder leave an upstairs apartment and start down the stairs. Each man was carrying a large box, and Balderas had a black bag slung over his shoulder. When they saw the SWAT team arriving, Balderas and Silder set everything down and started running. Moreno caught Silder in the apartment complex, while the SWAT team pursued Balderas into the neighborhood and caught him as he tried to hide under a car. Moreno saw that the boxes and bag contained firearms and other weapons, bullet-proof vests, identification holders, magazines, and ammunition. One of the weapons recovered from the box that Balderas had been carrying was a handgun that was later identified, through ballistics testing, as the murder weapon in Hernandez's killing. A shell casing from a semiautomatic handgun was recovered from Balderas's right rear pants pocket.

**SUFFICIENCY OF THE EVIDENCE**

In his first point of error, Balderas asserts that the evidence is insufficient to prove his guilt. Specifically, he argues that Wendy Bardales, the only eyewitness who identified him as the gunman, was not credible and testified falsely. He points to inconsistencies between her statements to police and her trial testimony, as well as ways in which her description of the gunman did not accurately describe Balderas. Balderas also alleges that Wendy's statements to police evolved over time: first, she did not recognize the gunman and had never seen him before; then, upon viewing the photo array, she immediately recognized Balderas, whom she had known for several months, but she was not sure that he was the gunman; and finally, she confidently identified Balderas as the gunman.

In assessing the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational juror could have found the essential elements of the crime beyond a reasonable doubt.[4] "Our review of 'all of the evidence' includes evidence that was properly and improperly admitted."[5] "The reviewing court must give deference to 'the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"[6] Each fact need not point directly and independently to a defendant's guilt, as long as the

---

[4] *Gardner v. State,* 306 S.W.3d 274, 285 (Tex. Crim. App. 2009).

[5] *Clayton v. State,* 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

[6] *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Jackson v. Virginia,* 443 U.S. 307, 318-19 (1979)).

cumulative force of all the incriminating circumstances is sufficient to support the conviction.[7]

The State may prove a defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence.[8] The jury is the sole judge of the credibility and weight to be attached to witness testimony.[9] When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination.[10] Because we will not second-guess the jury's assessment of the credibility and weight of witness testimony, and because we defer to the jury's resolution of conflicting inferences, Balderas's allegations that Wendy's testimony was false and not credible play no part in our review of the sufficiency of the evidence.

In this case, Balderas was tried under an indictment that alleged, in relevant part, that he, on or about December 6, 2005, "while in the course of committing or attempting to commit the burglary of a habitation owned by Durjan 'Rata' Decorado and Wendy Bardales, intentionally cause[d] the death of Eduardo Hernandez by shooting Eduardo Hernandez with

---

[7] *Id.*

[8] *Gardner,* 306 S.W.3d at 285.

[9] *Merritt v. State,* 368 S.W.3d 516, 525 (Tex. Crim. App. 2012) (citing *Jackson,* 443 U.S. at 319).

[10] *Thomas v. State,* 444 S.W.3d 4, 8 (Tex. Crim. App. 2014).

a deadly weapon, namely a firearm."[11]  A person commits murder when he "intentionally or knowingly causes the death of an individual."  A person commits burglary if, without the effective consent of the owner, he enters a building not then open to the public or a habitation with intent to commit a felony, theft, or assault; or he enters a building or habitation and commits or attempts to commit a felony, theft, or an assault.[12]  An "owner" is a person who has possession of a property or a greater right to possession of a property than the actor.[13]

"An unlawful entry into a habitation with the intent to commit murder will satisfy the burglary element of a capital murder charge."[14]  Further, "[i]t is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts, . . . and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill."[15]

Viewed in the light most favorable to the verdict, Wendy's eyewitness testimony and other evidence established that Balderas committed a burglary when he entered Decorado's apartment without Decorado's or Wendy's effective consent with the intent to murder Hernandez, and he committed murder when he intentionally caused Hernandez's death by

---

[11]  *See* TEX. PENAL CODE § 19.03(a)(2).

[12]  TEX. PENAL CODE § 30.02(a)(1), (3).

[13]  *Id.* at § 1.07(a)(35)(A).

[14]  *Whitaker v. State,* 977 S.W.2d 595, 598-99 (Tex. Crim. App. 1998).

[15]  *Ex parte Thompson,* 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005); *see also Medina v. State,* 7 S.W.3d 633, 637 (Tex. Crim. App. 1999).

shooting him with a firearm. Wendy identified Balderas as the gunman who opened the front door, entered the apartment, and shot Hernandez. Karen's testimony, together with the medical examiner's testimony, the autopsy, and the ballistics evidence, established that the gunman shot Hernandez in the head and back at least nine times. Karen's description of the gunman's clothing, and Diaz's description of Balderas's clothing immediately after the offense, were consistent with Wendy's description of the gunman's clothing.

Further, Diaz testified that while the ambulance was still at the apartment complex, Balderas approached him and other LTC gang members near the complex, stating that he had "finally got him" as he changed the magazine of his handgun. Ballistics evidence and Officer Moreno's testimony confirmed that the murder weapon was recovered from the box that Balderas discarded when he ran from the police ten days after the offense.[16] A rational jury could have determined from all of this evidence that Balderas, in the course of committing the offense of burglary, intentionally caused Hernandez's death. Thus, the evidence was sufficient to prove that Balderas was guilty of capital murder. Point of error one is overruled.

## DENIAL OF SPEEDY TRIAL

In point of error two, Balderas asserts that the trial court reversibly erred when it denied his motion to dismiss the indictment for lack of a speedy trial. Specifically, he

---

[16] *See Clay v. State,* 240 S.W.3d 895, 905 & n.11 (Tex. Crim. App. 2007) (noting that evidence of flight evinces a consciousness of guilt).

complains that the case "languished on the docket for eight years" following his arrest and indictment.

"The Sixth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, guarantees a speedy trial to an accused."[17] The Supreme Court has listed four factors that a court should consider in addressing a speedy-trial claim: (1) the length of delay, (2) the State's reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant because of the length of delay.[18] If the defendant can make a threshold showing that the interval between accusation and trial is "presumptively prejudicial," then a court must consider each of the remaining *Barker* factors and weigh them.[19]

When reviewing the trial court's application of the *Barker* test, we give almost total deference to the trial court's historical findings of fact that the record supports, and we draw reasonable inferences from those facts necessary to support the trial court's findings.[20] A reviewing court should not consider in its deliberations record evidence that was not before the trial court when it made its ruling.[21] Review of the individual *Barker* factors necessarily involves fact determinations and legal conclusions, but the balancing test as a whole is a

---

[17] *Gonzales v. State,* 435 S.W.3d 801, 808 (Tex. Crim. App. 2014).

[18] *Id.* (citing *Barker v. Wingo,* 407 U.S. 514, 530 (1972)).

[19] *State v. Munoz,* 991 S.W.2d 818, 821-22 (Tex. Crim. App. 1999).

[20] *Gonzales,* 435 S.W.3d at 808-09.

[21] *Id.* at 809 (citing *Dragoo v. State,* 96 S.W.3d 308, 313 (Tex. Crim. App. 2003)).

purely legal question that we review *de novo*.[22]  The record does not contain any written fact findings.

In general, courts deem delay approaching one year to be "unreasonable enough to trigger the *Barker* enquiry."[23]  The extent to which the delay exceeded the minimum needed to trigger judicial examination factors into our assessment of the first *Barker* factor.[24]  For example, an interval of three and one-half years "stretched far beyond the minimum needed to trigger the enquiry" and weighed heavily in favor of finding a violation of the speedy trial right.[25]

In this case, Balderas was arrested in December 2005 and tried in March 2014—an interval of more than eight years.  The length of this delay is sufficient to trigger the *Barker* inquiry.[26]  Further, because this delay stretched far beyond the minimum needed to trigger the inquiry, the first *Barker* factor weighs heavily in favor of finding a violation of Balderas's speedy-trial right.[27]

---

[22]  *Johnson v. State,* 954 S.W.2d 770, 771 (Tex. Crim. App. 1997).

[23]  *Dragoo,* 96 S.W.3d at 314 (quoting *Doggett v. United States,* 505 U.S. 647, 652 n.1 (1992)).

[24]  *See id.*

[25]  *Id.*

[26]  *See id.*

[27]  *See id*.

When we assess the second *Barker* factor—the State's reason for the delay—we assign different weights to different reasons.[28] Some reasons are valid and serve to justify an appropriate delay.[29] Deliberate delay intended to "hamper the defense" weighs heavily against the State, while more neutral reasons, such as negligence or overcrowded courts, weigh less heavily.[30] Additionally, we consider "whether the government or the criminal defendant is more to blame for th[e] delay."[31] Delay caused by either the defendant or his counsel weighs against the defendant.[32] "In the absence of an assigned reason for the delay, a court may presume neither a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay."[33]

At the hearing on Balderas's motion to dismiss for lack of a speedy trial, former prosecutor Spence Graham testified that he assumed responsibility for this case when he became the felony chief prosecutor for the 179th District Court in May 2009. His caseload included three cases against Balderas: this case, a second capital murder, and an assault. Balderas's file included six to eight banker's boxes full of offense reports, documents, and photographs. Through his review of the State's investigation of the LTC gang's activities,

---

[28] *Id.*

[29] *Id.*

[30] *Vermont v. Brillon,* 556 U.S. 81, 90 (2009).

[31] *Id.* (quoting *Doggett,* 505 U.S. at 651).

[32] *Id.* at 90-91.

[33] *Dragoo,* 96 S.W.3d at 314.

Graham was aware that Balderas was connected in some way to at least eleven homicides. The District Attorney had not yet decided whether to seek the death penalty in this case.

Graham did not know the details of the State's efforts to take this case to trial before he took responsibility for it. However, the paperwork he received when he assumed responsibility for the case reflected that the State's attorneys and investigators had done quite a bit of work on it. Someone had prepared charts of various LTC gang-related cases, including this one, that mapped out the different offenses, how the different pieces of evidence tied in with them, and which defendants were associated with which offenses.

In addition, the clerk's record reflects activity in this case from December 16, 2005 to May 2009—when Balderas was arrested to when Graham became the prosecutor, respectively. Specifically, the probable cause hearing took place on April 12, 2006. The magistrate found probable cause for further detention and set no bond, and Balderas requested the appointment of counsel. The initial indictment was also handed down on that date. Defense counsel signed "Agreed Settings" concerning the three charges pending against Balderas in August 2006 and January 2007, as well as two Agreed Settings in 2008.

Graham noted that, when he became the prosecutor in May 2009, this case was not the oldest case on the trial court's docket, which included 21 capital murders and over 1,000 pending cases, approximately 200 of which were already set for trial. The trial judge took judicial notice that, when her predecessor took the bench on January 1, 2009, the court's docket had 1,091 cases, with a jury trial docket of 155 cases.

Graham testified that, shortly after he became the prosecutor, he contacted defense counsel and sent them a "mitigation letter," requesting any mitigating information that might assist the District Attorney in deciding whether to seek the death penalty. He stated that the parties appeared in the trial court for status hearings every couple of months. At these hearings, defense counsel never indicated that they were ready for trial. Rather, they represented that they were still obtaining statements from Balderas's family members in Mexico and investigating Balderas's background. In addition, defense counsel told Graham that they were trying to persuade Balderas to let them offer a guilty plea in exchange for a sentence of life without parole.

According to Graham, defense counsel never indicated that they were ready to set this case for trial. Rather, counsel repeatedly asked Graham to hold off presenting the case to the District Attorney for a decision concerning the death penalty until they could deliver a mitigation packet and persuade Balderas to let them offer a plea deal.[34] Sometime in 2009, the trial court pressed for a resolution of the case, and a trial date was set. However, that date passed with no trial. Defense counsel delivered a mitigation packet to Graham in late 2009 or early 2010, but counsel also reported that they were still investigating mitigating evidence and negotiating with Balderas.

The trial court set this case for a second trial date of April 15, 2011, but the trial did not begin on that date. Our review of the clerk's record reflects that on that date, the parties

---

[34] *See, e.g.*, *Munoz,* 991 S.W.2d at 824-25 (deciding that delay caused by good faith plea negotiations should not weigh against the State).

agreed to a new setting of June 2, 2011. Graham stated that he could have taken this case to trial "as a nondeath" on April 15, 2011, because his two main witnesses were ready and the facts of the offense were "very simple." However, Graham "did not think it was appropriate to go to trial on th[is] case as a nondeath." This decision was due, in part, to a discovery that Graham made while preparing for the April 15 trial date. Specifically, he obtained Balderas's disciplinary records which revealed that, in 2010, Balderas had been disciplined for an aggravated assault on a public servant that he committed while confined in maximum security at the Harris County Jail. Graham testified that he did not discover this incident until he obtained Balderas's jail records in 2011 because the reporting officer did not contact him about it and it had not resulted in criminal charges. Graham needed additional time to investigate that incident and to communicate the situation to his supervisors in the District Attorney's Office who would make the "decision to ultimately seek death." Graham testified that the 2010 assault "really changed things for the wors[e]" for Balderas and "weighed heavily" in the District Attorney's decision to seek the death penalty. On April 28, 2011, Graham filed a notice of the State's intention to seek the death penalty.

Our review of the clerk's record shows that on June 2, 2011, the parties agreed to a new trial date of August 9, 2012. Graham stated that defense counsel continued to represent that they were urging Balderas to let them propose a guilty plea in exchange for a life sentence, but they never made such a proposal to Graham. Graham was reassigned to the Public Integrity Division of the District Attorney's Office in late 2011.

In January 2012, when Paula Hartman replaced Graham as the felony chief prosecutor for the 179th District Court, this case was still set for an August 2012 trial date. Hartman testified that she spent several months "get[ting] up to speed on the case in order to be ready for trial," and she would have been prepared to try this case by August 2012. However, in May 2012, defense counsel filed a motion for a continuance, asserting that the defense's investigation into both the guilt and punishment-phase issues could not be concluded by August, and that, without a continuance, the defense would be "substantially prejudiced in its ability to present a defense" at both phases of the trial. Although the typed order granting the continuance was titled, "Order on Unopposed Motion for Continuance," the trial judge made a hand-written note under his signature, stating that Balderas's motion was "granted over strong opposition of the State." The trial date was reset to February 2013.

The trial judge left the bench in December 2012, and the judge who ultimately presided over the trial took the bench in January 2013. Further, Hartman was reassigned to the Consumer Fraud Section of the District Attorney's Office in January 2013, and the prosecutor who ultimately took this case to trial assumed responsibility for it at that time. When the new judge took the bench, the 179th District Court's docket had 425 cases, with 44 jury trials set. With the agreement of both parties, the judge reset this case to September 2013. The case was reset again from September 2013 to January 2014 due to the illness of defense counsel, and the State did not agree to that continuance.

The State's inability to fully explain the delay from December 2005 until Graham became the chief prosecutor in May 2009 is troublesome, but the fact that defense counsel, even in 2009, requested additional time to investigate the case and negotiate with Balderas is some evidence that the defense played a role in the pre-2009 delay and would not have been ready for trial before then.[35] Further, Graham perceived that other State's attorneys and investigators had done a substantial amount of work on this case before he was assigned to it. The investigation of this offense was intertwined with the investigation of Balderas's other offenses, as well as other LTC gang-related offenses.

From May 2009 until the final resetting to the January 2014 trial date, defense counsel repeatedly urged the prosecutors and the trial court to delay the trial. Defense counsel represented as late as May 2012 that the defense's investigation was incomplete and that the defense would be "substantially prejudiced in its ability to present a defense" if the court did not grant a continuance. It appears that the State had acquiesced in the defense's previous requests for delays, but the State strongly opposed this motion for continuance. Further, although the State acquiesced in a delay in January 2013 because the newly-assigned judge and prosecutor were unfamiliar with the case, the State opposed the defense's request for a continuance in September 2013.[36] This factor weighs in favor of the State.

---

[35] *See Dragoo,* 96 S.W.3d at 314 (quoting *Harris v. State,* 827 S.W.2d 949, 957 (Tex. Crim. App. 1992)) (stating that a defendant's lack of a timely demand for a speedy trial "indicates strongly that he did not really want a speedy trial").

[36] *Cf. Zamorano v. State,* 84 S.W.3d 643, 650 (Tex. Crim. App. 2002) (finding

(continued...)

The third *Barker* factor—the defendant's assertion of his right to a speedy trial—is entitled to strong evidentiary weight in determining whether the defendant has been deprived of that right.[37] A defendant's lack of a timely demand for a speedy trial indicates strongly that he did not really want one.[38] The longer the delay becomes, "the more likely a defendant who wished a speedy trial would be to take some action to obtain it."[39] Thus, "inaction weighs more heavily against a violation the longer the delay becomes."[40] In this case, defense counsel expressly requested a substantial portion of the delay.[41] From 2009 to 2013, defense counsel consistently sought additional time for investigation and negotiation.

Not until January 29, 2014—after the jury had been selected—did defense counsel

---

[36] (...continued)
that, in simple DWI case, defense counsel's single announcement of "not ready," seeking a delay of three days to file pretrial motions and obtain the State's witness list, did not make appellant responsible for the preceding delay of approximately eight months and the subsequent delay of approximately three years).

[37] *Gonzales,* 435 S.W.3d at 810-11.

[38] *Dragoo,* 96 S.W.3d at 314.

[39] *Id.*

[40] *Id.*

[41] *Cf. Barker,* 407 U.S. at 532 (emphasizing that a defendant's failure to assert his right to a speedy trial will make it difficult for him to prove that he was denied a speedy trial); *see also Cantu v. State,* 253 S.W.3d 273, 284 (Tex. Crim. App. 2008) ("Under *Barker,* appellant's failure to diligently and vigorously seek a rapid resolution is entitled to strong evidentiary weight.") (internal quotation marks omitted).

assert the right to a speedy trial by filing a "Motion to Dismiss for Lack of a Speedy Trial."[42]

It is also significant that defense counsel sought to dismiss the indictment rather than hasten

the trial.[43] This factor weighs in favor of the State.

The fourth *Barker* factor focuses on prejudice to the defendant because of the length

of delay. To analyze prejudice, we consider three interests of defendants that the Speedy

Trial Clause was designed to protect: (1) preventing oppressive pretrial incarceration; (2)

minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the

defense will be impaired.[44] The last interest is the most important because the fairness of the

criminal-justice system is distorted when a defendant is unable to adequately prepare his

defense.[45] A defendant has the burden to make some showing of prejudice, but a showing

---

[42] *See, e.g.*, *Amos v. Thornton,* 646 F.3d 199, 207 (5th Cir. 2011) (noting that the third *Barker* factor can cut against a defendant when there was a lengthy delay between his arrest or indictment and his assertion of his speedy-trial right).

[43] *See, e.g.*, *Barker,* 407 U.S. at 535 (observing that, when defense counsel responded to a State's motion for a continuance by moving to dismiss the indictment, without moving in the alternative for an immediate trial, "the record strongly suggests that while [appellant] hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried"); *see also Cantu,* 253 S.W.3d at 283 ("Filing for a dismissal instead of a speedy trial will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one").

[44] *Gonzales,* 435 S.W.3d at 812.

[45] *Id.*

of actual prejudice is not required.[46] Excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or identify.[47]

At the hearing on his motion to dismiss for lack of a speedy trial, Balderas testified concerning the fourth *Barker* factor. He noted that he had been in continuous custody since his arrest on December 16, 2005, and he had never been granted bond. Balderas asserted that he did not know that he had the right to a speedy trial until he read about his case in the newspaper in April 2013, but he also acknowledged that he had not filed his *pro se* motion for speedy trial until January 17, 2014, after the jury had been selected.

Balderas testified that, if he had not been in custody, he would have continued his education. He stated that he graduated from high school in the summer of 2005, and before his arrest, he had begun completing financial aid paperwork so that he could enroll in 2006 in an architectural drafting program at Westwood College. Since his arrest, he had been taken to court once or twice a month. He testified that the extended incarceration had negatively affected his mental, physical, emotional, and spiritual well-being. He had lost several family members while in jail and had been unable to attend their funerals. He had not been employed or earning income. He had lost contact with family members who did not want to "visit an inmate accused of multiple capital murders." Balderas testified that there were nights when he could not sleep, and he had been "put on medication." He had

---

[46] *Munoz,* 991 S.W.2d at 826.

[47] *See, e.g., Shaw v. State,* 117 S.W.3d 883, 890 (Tex. Crim. App. 2003).

considered suicide. He still had a girlfriend who he had been dating since 2002, but they did not have contact visits.

Balderas testified that his brother passed away in 2012. His brother "would be here to testify for [him]" if he were alive. Balderas acknowledged that he had two other brothers living in the Houston area. However, his deceased brother "had certain knowledge about [Balderas's] past that [his] other brothers did not have," having experienced "some of the same abuse from family members that [Balderas] did." That abuse led his brother to commit suicide in 2012.

We presume that the lengthy delay here adversely affected Balderas's ability to defend himself.[48] The evidence of the disruption to Balderas's educational plans and personal life caused by his lengthy pretrial incarceration, as well as his anxiety and concern over the pending charges, is also probative of prejudice.[49] On the other hand, Balderas's argument regarding the disruption of his life plans is undercut by the fact that he was being held on other serious charges.[50] Also, Balderas testified that his brother could have testified about the sexual abuse that he and Balderas had suffered if the trial had taken place sooner.

---

[48] *See Shaw,* 117 S.W.3d at 890.

[49] *See, e.g.*, *Moore v. Arizona,* 414 U.S. 25, 27 (1973).

[50] *See, e.g.*, *Russell v. State,* 598 S.W.2d 238, 248 (Tex. Crim. App. 1980) (declining to find that a defendant had a right to be tried on a 1974 charge prior to being tried on a 1972 charge in another county); *Easley v. State,* 564 S.W.2d 742, 745 (Tex. Crim. App. 1978) (stating that prosecution on other charges constituted a valid reason for delay in bringing the defendant to trial, and that "whatever anxiety or concern he has experienced is not solely attributable to the delay in this case").

However, when the trial court made its ruling, the sexual nature of abuse was not before it; thus, we will not consider it on appeal because it was not at issue before the trial court.[51]

With that being said, however, the fourth *Barker* factor arguably weighs in favor of Balderas.

Having addressed the four *Barker* factors, we must now balance them. "[C]ourts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed."[52] Weighing in favor of finding a violation of Balderas's speedy trial right are the facts that the delay was excessive and that Balderas offered some evidence of prejudice resulting from the delay. Weighing against finding a violation is the fact that the defense, citing the need for additional time to conduct investigations and negotiations, requested most of the delay.[53] Any prejudice to Balderas was extenuated by his role in requesting the delay.[54] Further, Balderas did not assert his speedy trial right until after jury selection, indicating that he really did not want a speedy trial.[55] We hold that the weight

---

[51] *See Gonzales,* 435 S.W.3d at 809.

[52] *Cantu,* 253 S.W.3d at 281.

[53] *See, e.g., Munoz,* 991 S.W.2d at 825 (noting that the fact that the defendant was "in large part responsible" for the delay was "probably dispositive" of his speedy trial claim).

[54] *See Barker,* 407 U.S. at 534 ("More important than the absence of serious prejudice, is the fact that Barker did not want a speedy trial.").

[55] *See id.; Shaw,* 117 S.W.3d at 890-91.

of the four factors, balanced together, is against finding a violation of Balderas's right to a speedy trial.[56] Point of error two is overruled.

## ASSISTANCE OF INTERPRETER

In point of error three, Balderas asks: "Does a criminal defendant have a Sixth Amendment right under the United States Constitution to confront his accuser in the English language where the witness speaks, understands, and is fluent in English?" He asserts in his supporting argument that the appointment of a Spanish-language interpreter during his cross-examination of Wendy was improper under Article 38.30 and denied him his Sixth Amendment right to confront his accuser because Wendy spoke "perfect English." Balderas's entire point of error is multifarious because he bases it on several legal theories, and we could reject it for that reason. However, we will address it in the interest of justice.

Balderas argues that the appointment of an interpreter was improper because Article 38.30 does not allow a trial court to appoint an interpreter when a witness understands and speaks English. However, Balderas reads too much into Article 38.30. Article 38.30(a) describes the circumstances in which a trial court must appoint an interpreter, but it does not proscribe the appointment of interpreters in other situations:

> When a motion for appointment of an interpreter is filed by any party or on motion of the court, in any criminal proceeding, [and] it is determined that a person charged or a witness does not understand and speak the English

---

[56] *See Dragoo,* 96 S.W.3d at 315-16.

language, an interpreter must be sworn to interpret for the person charged or the witness.[57]

Article 38.30 is silent regarding situations in which a person charged or a witness arguably understands and speaks some English. Balderas does not direct us to any cases that support construing Article 38.30's silence as a prohibition on the appointment of an interpreter in such situations, and we have found none. We decline to adopt such a construction of Article 38.30 in this case. Thus, the trial court's appointment of an interpreter in this case was not improper under Article 38.30(a).

Balderas also argues that, if a trial court does not abuse its discretion by refusing to appoint an interpreter when the record shows that a witness or defendant possesses sufficient fluency in English to understand and participate in the proceedings, then the trial court necessarily abuses its discretion by appointing an interpreter under the same circumstances. In support of his assertion, Balderas relies on cases applying Article 38.30(a), in which appellate courts have concluded that a trial court did not abuse its discretion by declining to appoint an interpreter.[58] Balderas's all-or-nothing reasoning is not only logically unsound,

---

[57] TEX. CODE CRIM. PROC. art. 38.30(a); *see also* TEX. GOV'T CODE § 57.002 (a) (stating that the court "shall" appoint an interpreter for an individual who does not comprehend or communicate in English if a party files a motion for appointment of an interpreter or if a witness requests it) *and* (b) (the court "may" on its own motion appoint an interpreter for an individual who does not comprehend or communicate in English).

[58] *See, e.g., Flores v. State,* 509 S.W.2d 580, 581 (Tex. Crim. App. 1974).

but also misapprehends the abuse-of-discretion standard of review.[59] It is unreasonable to conclude that the trial court abused its discretion by appointing an interpreter simply because the court might not have abused its discretion if it had refused to do so.

Balderas devotes most of his supporting argument to his assertion that the trial court's appointment of an interpreter violated his Sixth Amendment right to confrontation. He reasons that Wendy "spoke perfect English," and therefore the interpreter served as a "shield" between the witness, the parties, and the jury. Balderas alleges that, because Wendy was allowed to testify in Spanish, the jury could not adequately assess her demeanor and manner. He further complains that the State used the interpreter "to hide [Wendy's] biased and untruthful demeanor and to explain the inconsistencies in her testimony as compared to the physical evidence." In oral argument before this Court, Balderas added that the use of an interpreter prevented defense counsel from employing cross-examination tactics such as "rapid-fire questioning."

Balderas asserts that the use of an unnecessary interpreter was particularly harmful in this case because the jury's assessment of Wendy's credibility "meant the difference

---

[59] *See, e.g.*, *Johnson v. State,* 433 S.W.3d 546, 557 n.53 (Tex. Crim. App. 2014) (explaining that, although the trial court did not abuse its discretion or violate the Confrontation Clause by prohibiting appellant from cross-examining witnesses charged with felonies concerning the particular ranges of punishment they faced, the trial court was not under any obligation to prevent such questioning); *see also United States v. Campbell,* 544 F.3d 577, 582 (5th Cir. 2008) (noting that the trial court, in light of its concerns, "was well within its discretion to deny the use of an interpreter" for a juror, and declining to resolve the question of whether the court nevertheless "could have ordered an interpreter").

between a guilty verdict and an acquittal." In support of this argument, Balderas notes that Wendy was the sole witness who identified him as the gunman. He also points out that, during deliberations, the jury twice requested a "read back" of Officer Ruland's testimony concerning his opinion of Wendy's credibility. Balderas appears to mean that the jury's repeated requests for this testimony signify that Wendy's credibility was a very important issue to the jury.

The Confrontation Clause gives a criminal defendant the right "to be confronted with the witnesses against him."[60] "[I]t is that personal presence of the defendant and the right to ask probing, adversarial cross-examination questions that lies at the core of an American criminal trial's truth-seeking function."[61] An attack on a witness's credibility may be "effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand."[62] Defense counsel should be permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, can appropriately draw inferences relating to the reliability of the witness.[63]

---

[60] *Coronado v. State,* 351 S.W.3d 315, 319 (Tex. Crim. App. 2011).

[61] *Id.* at 325.

[62] *Davis v. Alaska,* 415 U.S. 308, 316-17 (1974).

[63] *Id.* at 318.

Wendy, who was twenty-four years old at the time of trial, testified on direct examination that she began learning English when, at the age of twelve, she moved with her mother and sister to the United States from Honduras. She and her family spoke Spanish at home. Wendy learned English in some of her classes at school, but she did not attend school regularly. She dropped out in the ninth grade, when she was sixteen or seventeen years old. At the time of trial, Wendy still lived with her mother. They worked together, cleaning houses. Wendy testified that she thought in Spanish, so she had to translate "in [her] mind" when speaking English. She stated that she was sometimes unable to communicate "exactly what [she] mean[t]" in English.

Balderas filed a "Motion to Compel Witness to Provide Cross-Examination Testimony in the English Language," asserting that Wendy would use the interpreter as a shield to cover up her deception and that the use of an interpreter violated his rights to confrontation, cross-examination, and due process. The trial court held a hearing on this motion outside the jury's presence. During the hearing, the prosecutor acknowledged that Wendy could speak English but also stated that Wendy would be "more comfortable" testifying in Spanish. Balderas offered an audio recording of the conversation in which Wendy identified Balderas as the gunman for the second time. Balderas asserted that this recording would demonstrate Wendy's fluency in the English language. The court admitted this recording "for the limited purposes of this hearing."

The judge agreed with Balderas that Wendy's "comfort" in testifying did not outweigh his right to confrontation, but she concluded that the jury would get a "more accurate view" of Wendy's testimony if she testified through an interpreter. Specifically, the judge stated:

> [T]he record, I think, will speak for itself that there is an inherent language barrier that was evident to the Court, just in phrasings on the hearing that was conducted outside the presence of the jury yesterday [on Balderas's motion to suppress Wendy's identification of him] and it is my view that the jury will get an accurate—a more accurate view of Ms. Bardales'[s] testimony if allowed through a translator. So the motion is overruled.

The day before Balderas filed his motion to compel cross-examination without an interpreter, Wendy had testified through an interpreter at the hearing on Bardales's motion to suppress her identification of him as the gunman. She testified that, even though she positively identified Balderas as the gunman the first time that Ruland showed her the lineup containing his photograph, Ruland told her that he wanted to show her the lineup a second time "to make sure that [she] was sure." Wendy stated that she thought that there was a lack of communication between them and that they could not understand each other very well. When they met again, she told Ruland that she knew she had identified the right person from the photo lineup. Wendy also testified that, when she described the gunman in her statement to Cunningham, she did not know how to say "mole" or "birth mark" in English, and she would not have been able to distinguish between these terms without the aid of an interpreter. She did not recall using either term in her description of the gunman.

In addition, Sergeant Ruland testified at that hearing that it appeared to him that English was Wendy's second language. Also, although he had not noticed a language barrier

during most of their conversations, he came to suspect that his confusion over what Wendy

said when she first identified Balderas as the gunman was the result of a language barrier:

Q  You stated that you were a little unclear or confused about what she had told you.  Did you ever consider the fact that she may not have been a fluent English speaker?

A  I did.

Q  Did you?

A  Somewhat.

Q  Did you do anything to ascertain whether or not she spoke English well?

A  Just by conversing with her.  We could hold a conversation.  I could tell -- it appeared to me that maybe it was her second language.

Q  And why do you say it appeared to be her second language?

A  Just accent and some of the, the phrasings I would say.

Q  Did you ever ask her if she felt that she needed an interpreter?

A  I did not.

* * *

Q  Is it common that -- in your experience have you -- well, have you had the opportunity to speak to few or many people for whom English is a second language?

A  Many.

Q  And has it been your experience that people who have English as a second language often will not want to admit that they're not as fluent as you might believe them to be?

A  Yes.

Q  And I believe that Ms. Bardales was a 15-year-old teenager at the time of this interview?

A  Something like that, yes.

Q  Did she seem like she felt completely comfortable with the fact that she was talking to the police?

A  I would say no.  I think she was apprehensive about speaking to the police.

* * *

Q  You stated that you could tell that English was her second language.  What was it about her demeanor when she was speaking and listening to you that made you believe that?

A  Well, again, as I said, I think it was -- be the accent.  Sometimes she would think about what she was going to say and I think maybe she was maybe trying to translate certain things in her head.  I'm not sure.

Q  When she asked to write in Spanish, did you feel that perhaps there had been a communication problem that would explain why her statements in regards to the photo spread the day before were so odd to you?

A  Yes.  I thought that that might assist us because I told her we were trying to clarify her statements.  So then it was her idea to write this in Spanish; and I thought that she was attempting to do just what I had asked, clarify what she meant.

Courts have generally regarded the use of an interpreter for a material witness who has difficulty communicating in English as a requirement of the Confrontation Clause, rather than an encroachment on face-to-face confrontation, because the use of an interpreter enables a defendant to conduct a meaningful cross-examination.[64]  "[T]he appointment of an

---

[64] *See, e.g.*, *Miller v. State,* 177 S.W.3d 1, 5-8 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

interpreter for a material witness is required by the [C]onfrontation [C]lause and by article I, section 10, and must be implemented unless expressly waived if the trial judge is aware that the witness has difficulty understanding the English language."[65] The trial court abuses its discretion when it fails to appoint an interpreter for a material witness whose English skills are so poor that the defendant cannot conduct a meaningful cross-examination.[66]

In cases such as this one, in which the trial court appointed an interpreter for a witness, appellate courts have not imposed a requirement that the record affirmatively establish that the witness's English skills were so poor that, without the interpreter, the defendant would have been deprived of the ability to conduct an effective cross-examination. We decline Balderas's invitation to impose such a requirement now.

This Court has not previously defined the standard of review applicable specifically to the trial court's decision to appoint an interpreter. However, in considering challenges to the adequacy of interpretive services, this Court and other appellate courts have deferred to the wide discretion of the trial judge, who had direct contact with the witness, the parties, and the interpreter, to make decisions.[67] We see no reason to apply a different standard when considering the trial court's initial decision to appoint an interpreter. As with other decisions

---

[65] *Id.* at 5-6; *see also Garcia v. State,* 149 S.W.3d 135, 144-45 (Tex. Crim. App. 2004).

[66] *See Miller,* 177 S.W.3d at 5-8.

[67] *See, e.g., Linton v. State,* 275 S.W.3d 493, 503 (Tex. Crim. App. 2009); *see also United States v. Bell,* 367 F.3d 452, 463 (5th Cir. 2004) (quoting *Valladares v. United States,* 871 F.2d 1564, 1566 (11th Cir. 1989)).

regarding interpretive services, we conclude that the trial court's decision to provide an interpreter should not be reversed absent a clear abuse of discretion—that is, when the ruling lies outside the zone of reasonable disagreement.[68]

Balderas analogizes the assistance of an interpreter to the placement of a screen between a defendant and the witnesses who testify against him.[69] However, unlike the use of a physical barrier such as a screen or a disguise, the assistance of an interpreter does not interfere with the parties', witness's, or jurors' ability to observe each other. Thus, we are skeptical of Balderas's characterization of the assistance of an interpreter as an encroachment on face-to-face confrontation.[70]

Even if we assume *arguendo* that the use of an interpreter constituted an encroachment on face-to-face confrontation, we must still consider whether it was necessary to further an important public interest and whether the reliability of Wendy's testimony was otherwise assured.[71] The use of an interpreter for a witness whose primary language is not

---

[68] *Cf. Linton,* 275 S.W.3d at 503.

[69] *See Coy v. Iowa,* 487 U.S. 1012, 1016-22 (1988).

[70] *Cf. Coy,* 487 U.S. at 1016 ("the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact"); *Romero v. State,* 173 S.W.3d 502, 505-06 (Tex. Crim. App. 2005) (emphasizing that jurors' ability to view a witness's face is traditionally regarded as one of the most important factors in assessing credibility).

[71] *See Romero,* 173 S.W.3d at 505 ("An encroachment upon face-to-face confrontation is permitted only when necessary to further an important public interest and when the reliability of the testimony is otherwise assured.").

English is necessary to further an important public interest when it ensures that the defendant can conduct an effective cross-examination and that the jury has an accurate understanding of the witness's testimony. The trial judge's finding of "an inherent language barrier," and her determination that the jury would get "a more accurate view of [Wendy's] testimony if allowed through a translator," signaled that an interpreter was necessary to further this interest. We will defer to the trial court's wide discretion on this matter.

In determining whether the reliability of Wendy's testimony was otherwise assured, we examine the extent to which the proceedings respected the four elements of confrontation: physical presence, oath, cross-examination, and observation of demeanor by the trier of fact.[72] Physical presence and oath are not at issue in this case. The record shows that Wendy testified in person in the courtroom, and before she testified, she swore an oath to tell the truth. The trial court reminded her of that oath before cross-examination began.[73]

Balderas's allegations on appeal implicate only the elements of cross-examination and observation of demeanor. Concerning cross-examination, Balderas does not assert that, because of the interpreter, he was prevented from asking Wendy, or obtaining her response to, any particular question.[74] The Confrontation Clause guarantees only an opportunity for

---

[72] *See id.*

[73] *See id.*

[74] *See Bell,* 367 F.3d at 464 (finding no violation of a defendant's confrontation rights when he was able to cross-examine the complaining witness through an interpreter).

effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, a defendant might wish.[75] "[A] 'less than optimal' opportunity for cross-examination does not, of itself, violate the Sixth Amendment."[76] Further, although the cross-examiner is permitted to "delve into the witness's story to test the witness's perceptions and memory" and to impeach or discredit the witness, he remains subject to the broad discretion of the trial judge to preclude repetitive and unduly harassing interrogation.[77] Without more, Balderas's generalizations about potential hindrances to the truth-testing function of cross-examination, and his inability to employ particular cross-examination tactics such as "rapid-fire questioning," do not show that the assistance of the interpreter in this case adversely affected the cross-examination element.

Concerning the fourth element of confrontation, Balderas alleges that the use of the interpreter enabled the State "to hide [Wendy's] biased and untruthful demeanor." Balderas asserts, "The jury could not notice or detect Wendy Bardales's voice inflection, facial expressions, speech patterns, etc. when the jury spoke English and the witness testified in Spanish through an interpreter." However, Balderas does not assert, and nothing in the record suggests, that he and the jurors were unable to view Wendy, or that Wendy was unable to view them, at any time during cross-examination. Wendy's speaking Spanish would not

[75] *Johnson,* 433 S.W.3d at 557 & n.48.

[76] *Id.*

[77] *Cf. Davis,* 415 U.S. at 316.

"hide" her demeanor from jurors, notwithstanding any arguable detriment to an English-speaking juror's ability to accurately assess nuances such as voice inflection and speech patterns. Because the jurors were able to view Wendy throughout the examination, they could discern for themselves whether Wendy's demeanor was "biased and untruthful."

Balderas also argues that the use of the interpreter enabled the State to "explain the inconsistencies in [Wendy's] testimony as compared to the physical evidence." We understand Balderas to argue that the assistance of an interpreter could impede a defendant's efforts to show that inconsistencies between the witness's statements and other evidence were the result of dishonesty rather than a language barrier. We find no such impediment under the facts of this case. The jury was presented with evidence that Wendy understood and spoke English fairly well. Wendy testified that she could speak English and she acknowledged that, in the weeks before the trial, she communicated with the District Attorney's staff in English. She also acknowledged that, by the time of the trial, she had learned to read English. During cross-examination, she occasionally answered a question in English without waiting for the interpreter, and she acknowledged that she understood some of the questions in English. Cunningham and Ruland, who interviewed Wendy in the days after the offense, both testified that they did not perceive the need for an interpreter and that they had no difficulty communicating with Wendy in English. The jury learned that, during Ruland's third interview with Wendy, she wrote a sentence in Spanish indicating that she understood, but could not write, English.

In addition, the use of an interpreter did not deprive Balderas of an opportunity to effectively cross-examine Wendy about the inconsistencies between her statements and the other evidence. Specifically, Wendy acknowledged that, although she had described the suspect as having a dark mark on his face, no such mark was visible on the photograph of Balderas's face in the photo array, and when she viewed Balderas in the courtroom, he had only a mole on his face. She also acknowledged that she had described the murder weapon as a black handgun, while the weapon the State presented as the murder weapon was gray or silver with a black handle. In addition, Wendy had claimed in her statement to police that the gunman shot at her until his gun was empty, but at trial, Balderas pointed out that the crime scene evidence and Ferrufino's testimony indicated that no shots had been fired toward Wendy.

When confronted with such inconsistencies, Wendy sometimes suggested that they were misunderstandings arising from a language barrier, but she frequently testified that she did not remember what she said or why. She acknowledged that her memory would have been better when she gave her statement to police in 2005 than it was at the time of trial in 2014.

The record shows that Balderas argued to the jury that Wendy did not need an interpreter because she spoke English well, and that the use of the interpreter cast doubt on Wendy's credibility. Balderas also argued that the discrepancies between Wendy's statements and the other evidence established that her testimony was not credible. The trial

court and the jury were in the best position to draw their own conclusions based on their personal observations of the proceedings. We will not second-guess those conclusions on appeal.

We conclude that the trial court did not abuse its discretion under Article 38.30 by appointing an interpreter for Wendy and denying Balderas's motion to compel cross-examination in the English language. We also conclude that the assistance of the interpreter did not deprive Balderas of his Sixth Amendment right to confront Wendy. Point of error three is overruled.

In point of error four, Balderas asks:

> If a criminal defendant does not have a Sixth Amendment right . . . to confront his accuser in English, does he at least have the right to cross-examine and impeach his accuser concerning her ability to speak English so that the jury might be made aware of her attempt to mask the extent of her fluency?

Although Balderas's stated point of error appears to complain of a limitation on cross-examination, his argument focuses on the trial court's evidentiary ruling that excluded the audio recording of the conversation in which Wendy identified Balderas as the gunman for the second time. Because Balderas's argument is unclear and relies, apparently, on multiple legal theories, we could reject this point of error as inadequately briefed and multifarious.[78] Nevertheless, in the interest of justice, we will address Balderas's argument as we understand it.

---

[78] TEX. R. APP. P. 38.1.

Balderas appears to argue that the trial court's exclusion of the audio recording violated the Sixth Amendment by preventing him from effectively cross-examining Wendy concerning her English fluency. He asserts that the audio recording could have impeached Wendy by demonstrating to the jury that: (1) Wendy lied about her English-language proficiency, and (2) the apparent inaccuracies and discrepancies in her statements to police stemmed from her personal animosity toward Balderas rather than a language barrier.

At the end of the trial, Balderas attempted to offer the audio recording into evidence. The trial court asked Balderas why the recording was not hearsay. Balderas stated that he was offering it to show Wendy's ability to communicate in English. He argued that Wendy's ability to speak English was subject to cross-examination and that the audio recording was impeaching of her testimony that she had trouble communicating in English when she spoke with the police. The prosecutor objected to the admission of the audio recording on grounds that it was hearsay, irrelevant, and improper impeachment evidence because no one had claimed that Wendy could not speak English. The trial court excluded the audio recording without making any express reference to Balderas's arguments or the State's objections, instead simply noting that the jury could draw conclusions about Wendy's ability to speak English from the testimony of the live witnesses. In post-submission briefing, Balderas argues that the trial court should have admitted the audio recording as demonstrative

evidence. To the extent that he means to assert a separate ground for admission, Balderas did not urge this ground, or obtain a ruling on it, at trial.[79]

Evidentiary rulings rarely rise to the level of denying fundamental constitutional rights to present a meaningful defense.[80] A ruling might rise to this level if it is "clearly erroneous" and if it excludes "otherwise relevant, reliable evidence which forms such a vital portion of the case" that the ruling "effectively precludes the defendant from presenting a defense."[81]

The record does not support Balderas's complaint that the trial court's exclusion of the audio recording prevented him from effectively cross-examining Wendy concerning her English fluency. As discussed in point of error three, Balderas did effectively cross-examine Wendy concerning her ability to speak English. Through Wendy's testimony, as well as the testimony of the police investigators who interviewed her, the jury learned that Wendy understood and spoke English fairly well.

Further, the audio recording conveys an impression of Wendy's ability to understand and speak English that is generally consistent with the impression given by the witnesses' trial testimony, which was that Wendy understood and spoke some English but that English was her second language. As discussed in point of error three, the Sixth Amendment did not

---

[79] *See* TEX. R. APP. P. 33.1; *see also Yazdchi v. State,* 428 S.W.3d 831, 844 (Tex. Crim. App. 2014) ("For a party to preserve a complaint for appellate review, the complaining party must make a specific objection and obtain a ruling on the objection.").

[80] *Williams v. State,* 273 S.W.3d 200, 232 (Tex. Crim. App. 2008).

[81] *Id.*

entitle Balderas to cross-examine Wendy in whatever way, and to whatever extent, he wished.[82] The trial judge had broad discretion to preclude repetitive and unduly harassing interrogation.[83] The trial court did not violate the Sixth Amendment by excluding the audio recording. Point of error four is overruled.

In point of error five, Balderas asks: "Did the trial court abuse its discretion by allowing Wendy Bardales to testify in Spanish?" We resolved this question against Balderas in our discussion of point of error three; therefore, we answer Balderas's question in the negative. Point of error five is overruled.

## *GASKIN* RULE VIOLATION

In point of error six, Balderas asserts that the trial court violated the *Gaskin*[84] Rule by improperly denying him the opportunity to impeach Wendy with her prior audio recorded statement to police. Balderas misunderstands the *Gaskin* Rule, which entitles a defendant to inspect a State's witness's prior statements, if they relate to the subject matter of the witness's testimony, for use in cross-examination and impeachment.[85] Balderas acknowledges, and the record reflects, that he had a copy of the recorded statement. Thus, there was no violation of the *Gaskin* Rule. Point of error six is overruled.

---

[82] *See Johnson,* 433 S.W.3d at 557 & n.48.

[83] *Cf. Davis,* 415 U.S. at 316.

[84] *Gaskin v. State,* 353 S.W.2d 467 (Tex. Crim. App. 1961).

[85] *See, e.g.*, *Enos v. State,* 889 S.W.2d 303, 305 (Tex. Crim. App. 1994); *see also* TEX R. EVID. 615.

## OUTSIDE INFLUENCE ON THE JURY'S DELIBERATIONS

In point of error seven, Balderas asks, "Was the appellant deprived of due process of law and an impartial jury by an outside influence acting upon the jury during their deliberations?" Balderas explains that this "outside influence" was his brother's act of standing near the street and waving at a bus that carried the jurors from the courthouse to their hotel. Balderas asserts that there is a reasonable probability that this incident had a prejudicial effect on the verdict because jurors who were questioned by the judge acknowledged that they were fearful as a result of this incident. He theorizes that this fear motivated jurors who had doubts about his guilt to abandon their reservations in order to reach a verdict quickly "and escape the situation." In support of this theory, Balderas asserts that the jury reached a guilty verdict the morning following the incident after just two hours of deliberation, although the jury foreman had reported that the jury was deadlocked when deliberations ended the previous day.

Any private communication, contact, or tampering with a juror, directly or indirectly, during a trial about the matter pending before the jury is presumptively prejudicial, if such contact is not authorized by the court and is made without the knowledge of the parties.[86] The United States Supreme Court in *Remmer v. United States* remanded that case to the trial court for a hearing, stating that the State had the burden to show that such contact was

---

[86] *See Remmer v. United States,* 347 U.S. 227, 229 (1954).

harmless to the defendant.[87] However, the Supreme Court later cited *Remmer* as one case in a long line of cases which concluded that the proper remedy for allegations of juror bias was a hearing in which the defendant had the opportunity to prove actual bias.[88] In *Smith v. Phillips,* the Court observed that it is "virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote."[89] Thus, due process did not require a new trial every time a juror was placed in a potentially compromising situation, but instead required a jury able and willing to decide the case solely on the evidence before it.[90] Since *Phillips,* the Supreme Court has framed the "ultimate inquiry" as: "[d]id the intrusion affect the jury's deliberations and thereby its verdict?"[91]

Similarly, this Court has held, "When a juror converses with an unauthorized person about the case, 'injury to the accused is presumed' and a new trial may be warranted."[92] However, this presumption is rebuttable.[93] When determining whether the State sufficiently rebutted this presumption, we view the evidence in the light most favorable to the trial court's ruling and defer to the trial court's resolution of historical facts and its determinations

---

[87] *Id.*

[88] *Smith v. Phillips,* 455 U.S. 209, 215 (1982).

[89] *Id.* at 217.

[90] *Id.*

[91] *See United States v. Olano*, 507 U.S. 725, 739 (1993).

[92] *Quinn v. State*, 958 S.W.2d 395, 401 (Tex. Crim. App. 1997).

[93] *Ocon v. State*, 284 S.W.3d 880, 885 (Tex. Crim. App. 2009).

concerning credibility and demeanor.[94]  We consider only those arguments that were before the court at the time of the ruling.[95]  We review a trial court's denial of a mistrial for an abuse of discretion.[96]

In this case, the record does not reveal precisely when the behavior of Balderas's brother was first brought to the trial court's and the parties' attention.  The first mention of this incident on the record appears after the jury found Balderas guilty, but in the hearing that ensued, it was apparent that the trial court had been apprised earlier that day of the incident.  Specifically, after the foreman announced the verdict and the parties declined to have the jury polled, the trial court excused the jury.  The judge then asked counsel to approach the bench, and following an off-the-record discussion, she presided over a hearing concerning this incident.

The judge first called Deputy Patrick Henning, who had accompanied jurors to their hotel on the previous evening:

THE COURT:  For efficiency['s] sake, Deputy Henning, if you would, just give a summation of what it was that you told me this morning in chambers regarding the jury as you left last night to go to their sequestered hotel.

DEPUTY HENNING:  Approximately 6:30 as we were leaving on the bus on Commerce Street, just across San Jacinto when several of the jurors started saying, He's waving at us.  He's waving at us.

---

[94] *Quinn*, 958 S.W.2d at 401-02.

[95] *Ocon*, 284 S.W.3d at 884.

[96] *Id.*

And I said, who? And they said, the defendant's brother. I advised the bus driver to stop. I got off. I didn't know what the brother looked like. They just gave me an ID of he's wearing a white hoodie, he's going down the street. He was already on the other side of San Jacinto and the bayou, pretty much across the bridge. I couldn't leave the jury. I stayed with the jury and I went to the hotel.

THE COURT: Did you see him waving at the jury?

DEPUTY HENNING: I did not see him. I was on the opposite side of the bus. They were on the right side of the bus when they saw him.

THE COURT: Did any of the jurors repeat or report anything other than a wave?

DEPUTY HENNING: A smirk on his face as he did it. They said he stood there, waved with a smirk on his face until the bus was all the way past.

THE COURT: Do you have any questions, [defense counsel]?

[DEFENSE COUNSEL]: You said that y'all stopped? You stopped and what?

DEPUTY HENNING: I had the bus driver stop so I could ID him, but I didn't know what he looked like. And by the time I stepped off the bus, he was already across the bridge. So I didn't leave the jury. I stayed with the jury and we left.

[DEFENSE COUNSEL]: And the jurors were all together on the bus?

DEPUTY HENNING: All together on the bus, everybody was on the bus with Deputy Dearmon and myself.

[DEFENSE COUNSEL]: So whatever happened, everybody at least heard?

DEPUTY HENNING: Everybody on the bus heard and understood what happened.

[DEFENSE COUNSEL]: And who made the identification that that was the accused's brother?

DEPUTY HENNING:  I will say about five or six of the jurors at least.  I can't tell you which ones right now but everybody that was on that side of the bus was probably five, six people identified that's the brother, that's the brother, he's waving.

[DEFENSE COUNSEL]:  And was there any discussion about why they knew that was his brother, i.e., did they recognize him from court?

DEPUTY HENNING:  They said I've seen him in the courthouse and in the courtroom, that's the brother.  There was no doubt in their mind it was the brother.

[DEFENSE COUNSEL]:  Okay.

DEPUTY HENNING:  And then at that point, I advised them not to discuss it, not bring it up.

[DEFENSE COUNSEL]:  And whatever gesture, contact, whatever you want to call it, did they seem to be alarmed or offended by it?

DEPUTY HENNING:  Several of them were very alarmed.

[DEFENSE COUNSEL]:  And how was that alarm expressed to you or how did you discern that they were alarmed?

DEPUTY HENNING:  Once we got to the hotel, got them in their rooms, two of the ladies commented about it.  I advised them, don't worry, don't think about it, it'll be brought up with the Judge tomorrow.  Deputy Dearmon called me, one of the female jurors was in somewhat of a panic.  She wanted to call her family because she was worried that somebody knew where she lived in her mind.  [sic]

[DEFENSE COUNSEL]:  Okay.

DEPUTY HENNING:  Now, when she came to the room, she at that time told me she did not see the person wave, she was on the bus.  Of course everybody said it but she didn't see the person wave.  But she believed all the other jurors because they said it was the brother.

[DEFENSE COUNSEL]:  So she was responding to what they --

DEPUTY HENNING:  She was worried, yes.

[DEFENSE COUNSEL]:  And you say she was worried that -- at that point about not only potentially her safety but the safety of her family?

DEPUTY HENNING:  Yes.

[DEFENSE COUNSEL]:  Okay.  Nothing further.

THE COURT:  State have anything?

[PROSECUTOR]:  No.

THE COURT:  Just for whoever may be reading this record in the future, Deputy Henning, members of the State prosecution team and defense are acquainted with Deputy Henning but he is not the normal bailiff or process server assigned to the 179th.  He was on loan to us yesterday so he doesn't know any of the family members and he's not acquainted with the jury although he did escort them to their hotel last night.  So that that's clear.

Thank you, Deputy Henning.

Do you-all still want to speak to the juror?

[DEFENSE COUNSEL]:  I do, Your Honor.

Deputy Henning, I'm sorry.  Before you go, are you able to identify who the other jurors were?

DEPUTY HENNING:  I'd have to look at their faces because it was on the bus. It was dark, and when the bus driver stopped, [the] door opened, the light came on.  I could see who was on that side of the bus, but I didn't individually go up and say, did you see it, did you see it.

THE COURT:  Can you just go back there and ask, would you recognize them and what's your name.  Don't say who saw anything on the bus.  Just ask their names so you can report back to us.

At defense counsel's request, the judge then called the juror who had been "in somewhat of a panic" at the hotel. The following exchange ensued:

THE COURT: It's been reported to me that there might have been an incident last night while you-all were on the bus going to --

[DEFENSE COUNSEL]: Your Honor, I'm sorry. Before you -- just identify her for the record by a number or something?

THE COURT: Yes. This is Juror, first initial A. last initial B, she's the only one on the jury with those initials. It has been reported to us that there was an incident last night as the jury was being transported to the hotel from the courthouse. Did you see it?

[JUROR A.B.]: I did not see it.

THE COURT: It's my understanding that you were made aware of that incident; is that right?

[JUROR A.B.]: Yes.

THE COURT: And how were you made aware of that? Did other jurors tell you?

[JUROR A.B.]: The other juror said -- the ones who saw it said, oh, he waved at us. That's when they stopped the bus and both deputies got off.

THE COURT: But you didn't see that?

[JUROR A.B.]: I didn't see this.

THE COURT: Did that affect you in any way?

[JUROR A.B.]: I felt like it potentially was a tactic to intimidate or threaten perhaps.

THE COURT: Did you feel intimidated or threatened?

[JUROR A.B.]: I felt cautious.

THE COURT: Did any of that feeling of cautiousness weigh in your deliberations this morning when you came back to return to deliberations?

[JUROR A.B.]: No.

THE COURT: Okay. Do you have any further questions from either side?

[PROSECUTOR]: No, ma'am.

[DEFENSE COUNSEL]: Just very briefly, I understand that it was to an extent on a level that you asked to call your family; is that correct?

[JUROR A.B.]: That is correct.

[DEFENSE COUNSEL]: And you wanted to make that phone call for what purpose?

[JUROR A.B.]: Again, out of caution. Because he's home with my 9-year-old and 3-year-old.

[DEFENSE COUNSEL]: And when you say out of caution, at that point are you -- did you entertain some fear perhaps from the accused['s] family? Is that what the caution was?

[JUROR A.B.]: I don't know. The person who did it is in the courtroom.

THE COURT: Hold on. You guys have to talk in here.

[JUROR A.B.]: I assumed that he is somehow related to, somehow associated with the defendant, the family or acquaintance. Not knowing the jury process, I didn't know if there was any way in public record that we could ever be identified by name, knowing that if I could be identified by name, anyone can look up our address or our personal information.

[DEFENSE COUNSEL]: Really just two other questions, either on the bus or at the hotel or when you returned to the jury room to today [sic] --

[JUROR A.B.]: Yes.

[DEFENSE COUNSEL]: -- was there any further discussion about that incident?

[JUROR A.B.]:  There was this morning.

[DEFENSE COUNSEL]:  In the jury deliberation room?

[JUROR A.B.]:  As we first entered before we began deliberating.

[DEFENSE COUNSEL]:  Who brought it up?

[JUROR A.B.]:  I think I said something to another juror.

[DEFENSE COUNSEL]:  Okay.  And I don't want to invade the deliberation process --

[JUROR A.B.]:  Not at all.

[DEFENSE COUNSEL]: -- but what I want to know is why did you bring it up this morning in the jury room?  It was still something that you were concerned about?

[JUROR A.B.]:  I think my question was, I wonder if that person would be in court today.

[DEFENSE COUNSEL]: Okay.  And in fact, I was told during one of the read outs -- and obviously I wasn't here this morning.  During those read outs, that as the readings were being done, you were kind of leaning over looking into the audience.  Is that right, trying to see if you could find him?

[JUROR A.B.]:  I've looked into the audience throughout the process.  I looked in the audience today.

[DEFENSE COUNSEL]:  Did you see that person?

[JUROR A.B.]:  I did not notice him.

[DEFENSE COUNSEL]:  Okay.

[JUROR A.B.]:  But I'm not sure of his specific physical characteristics because I didn't see him.

[DEFENSE COUNSEL]:  And the final question I have for you is:  How, if at all -- a, did that affect or going forward, will it affect your ability to continue to serve as a juror in this case?

[JUROR A.B.]:  I don't believe it affects my ability at all, but if you're uncomfortable with it, I'm not going to take it personally.

[DEFENSE COUNSEL]:  And unfortunately, that's not the issue whether I'm comfortable with it or not.  The bottom line is are you saying that whatever that was, whatever it was, it will in no way affect you as you continue to serve in this case?

[JUROR A.B.]:  No, sir.

[DEFENSE COUNSEL]:  And you're certain about that?

[JUROR A.B.]:  I am certain about that.

[DEFENSE COUNSEL]:  Okay.

THE COURT:  Any questions?

[PROSECUTOR]:  No, ma'am.

THE COURT:  Thank you very much.  You may go back to the jury room.

(Juror left courtroom.)

Defense counsel then stated that he wanted to talk to one of the jurors who had seen the incident.  He asked Deputy Henning if he could identify such a juror, and Henning identified "Darlene" as "the main one" who had been "adamant that it was the brother":

THE COURT:  Anything else from the defense?

[DEFENSE COUNSEL]:  Yes, sir, I think he was trying --

DEPUTY HENNING:  Two of our regular jurors and one alternate.

[DEFENSE COUNSEL]:  Since she heard about it, I wanted to talk to one of those who actually saw this person, saw what they were doing.  Can you distinguish?

DEPUTY HENNING:  I know which -- Darlene was the main one.  She was sitting on the left side next to the right.  [sic]  She actually was the one who made it adamant that it was the brother.

[DEFENSE COUNSEL]:  Judge, I would like for her to be brought out just so you can question her.

THE COURT:  Okay.

[PROSECUTOR]:  Judge, while we're having her brought out, I would just like to note for the record that this was a Thursday morning when the jurors were brought out for that other read back and it is the Court's heavy docket day and there were substantially more people in the courtroom than there generally are and that could have been the reason for some of the looking around.

THE COURT:  That is true.  The Court had well over a hundred cases on our docket this morning, easily over 45 defendants and family members still sitting in the audience at the time when the read back was read.

As requested by defense counsel, the judge called the juror that Henning had identified:

THE COURT:  Come on up, up here.  For the record, this Juror will be identified by her first and last initials as D. T.

So, we're -- I understand that there was an incident last night on the bus.

* * *

THE COURT:  There was an incident on the bus as the jury was traveling from the courthouse to the restaurant where you went to eat for dinner.  Can you briefly explain what that was.

[JUROR D.T.]:  Well --

THE COURT:  And for the record, you saw it?

[JUROR D.T.]:  Yes, I saw it.

THE COURT:  Explain what you saw, please.

[JUROR D.T.]:  We were right there by where the construction is where the bayou is where the coffee company, I guess, is.  And somebody had said, Oh, my god, there's his brother.  And I turned and he was standing on the curb with this smirk on his face and he just kind of was waving.  And I was like, Oh, my god, that's him.  He's waving at us.

And so, Pat --

THE COURT:  Deputy Henning.

[JUROR D.T.]:  He told the driver to stop and he got off the bus.  Then the lady deputy got off the bus and then the driver stood and guarded the door while they chased him down the street.  But by then, he had already taken off.

THE COURT:  And outside the smirk and the wave, was there any additional behavior on his part?

[JUROR D.T.]:  Not that I saw, because I didn't see him leave.

THE COURT:  And I'm just a little confused.  How did you know it was the defendant's brother?

[JUROR D.T.]:  We just figured that that's who that was.

THE COURT:  So you don't even know that that's who that was.

[JUROR D.T.]:  No.

THE COURT:  Have you seen him in the courtroom during the trial?

[JUROR D.T.]:  Yes, uh-huh.

THE COURT:  And what was he wearing?

[JUROR D.T.]:  Yesterday?

THE COURT:  Yes, ma'am.

[JUROR D.T.]:  Like a white sweatshirt, a large white sweatshirt.

THE COURT:  Anything else, [defense counsel]?

[DEFENSE COUNSEL]:  You had indicated that seeing him at the bus stop [sic] and you said that that individual was chased by the deputy?

[JUROR D.T.]:  He went down the street after him.

[DEFENSE COUNSEL]:  Did that person appear to be running or fleeing?

[JUROR D.T.]:  I didn't see him.

[DEFENSE COUNSEL]:  You didn't see him.  Okay.  After -- how much discussion of this incident occurred on the bus?

[JUROR D.T.]:  Not very much other than, oh, my god, there he is.  And then --

[DEFENSE COUNSEL]:  And by the way, when one says that, Oh, my god, what was going on in your mind at that time?  You think he was following you guys, stalking you, or what?

[JUROR D.T.]:  To be honest, I was, like, why is he there.  And I thought -- I thought, they were supposed to --

THE REPORTER:  I can't hear.

[JUROR D.T.]:  I was like, I thought they were supposed to keep people away from us and there he was on the street.

[DEFENSE COUNSEL]:  After -- during the dinner, I assume, was there any discussion of this at all?

[JUROR D.T.]:  No.

[DEFENSE COUNSEL]:  When you got back today, was there any discussion in the jury room at any part of the beginning or middle or anything, was there any discussion of this?

[JUROR D.T.]:  I did.  The two deputies sat with me at breakfast this morning, and I just said that I was concerned.

[DEFENSE COUNSEL]:  Okay.  Let's stop there for a minute.  What was the nature of your concern?

[JUROR D.T.]:  Because, like I said, I thought they were supposed to keep people away from us.  And I don't know what kind of information that he has of us.  Due to the nature of the case, I just told them that I was going to hold my gun closer at night.

[DEFENSE COUNSEL]:  You were going to hold your gun closer at night?

[JUROR D.T.]:  Uh-huh.  And I don't think that's funny at all.

[DEFENSE COUNSEL]:  No, no, no.  I am not saying it for that.  That suggests to me that you were more than just a little concerned.

[JUROR D.T.]:  Uh-huh.

[DEFENSE COUNSEL]:  How do you feel right now?

[JUROR D.T.]:  I feel better after talking to the deputy.  He kind of put my mind at ease, that it's because of the circumstance that we're in and the things that are going on kind of makes you jumpy.  And he said it's perfectly normal for you to be jumpy.

[DEFENSE COUNSEL]:  Going forward, is that incident going to or do you think it may influence how you listen to witnesses in this case and what decisions that you may have to make or not at this phase of the trial?

[JUROR D.T.]:  No.  Because I even told the deputies, I said irregardless [sic] of what he did and what I saw, it's not going to change my decision in this case.

[DEFENSE COUNSEL]:  Well, as to one decision you've already made; but I guess I'm more concerned now about any decision that you have to make moving forward, it's not going to influence that either?

[JUROR D.T.]:  Has nothing to do with him.

[DEFENSE COUNSEL]:  Then the final thing I need to ask and I need to make sure, because when you said, It's not funny, I didn't mean to convey that. I want to make absolutely sure that you're not going to hold your perception that I --

[JUROR D.T.]:  No.

[DEFENSE COUNSEL]:  -- against Juan?

[JUROR D.T.]:  No.  No.  I mean, you interviewed me during whatever you call the voir dire or whatever and you know perfectly well I don't have a problem expressing my opinion at all.

[DEFENSE COUNSEL]:  That's why we put you on here.

[JUROR D.T.]:  Okay.  Thank you.

THE COURT:  Thank you very much.

(Juror left courtroom.)

Defense counsel then moved for a mistrial, arguing that the incident influenced jurors who were "holding out for the defense" to change their vote:

[DEFENSE COUNSEL]:  At this time the defense would move for a mistrial. We believe that the verdict was reached as a result of an outside influence, that it influenced the jurors to -- if that [sic] were holding out for the defense, to change their vote.  We'd argue that the verdict is not made in a vacuum, that this was not a fair expression of the jurors' opinion.  It violates the defendant's

right to a impartial jury. It violates his right to due process and to a fair trial. And we would cite Granados v. State and -- which is 85 S.W.3d 217 and O'Con [sic] v. State -- O-C-O-N, which is 284 S.W.3d 880, which states that the jurors must use information obtained only in the courtroom, from the law, the evidence, and the Trial Court's mandates. We'd ask the Court at this time to declare the mistrial.

THE COURT: That will be denied.

[DEFENSE COUNSEL]: Your Honor, may I add to that. We'd also argue that it denies the defendant a fair and impartial jury under Section 1.05 of the Code of Criminal Procedure.

THE COURT: That is noted.

[DEFENSE COUNSEL]: And also denied, I'm assuming?

THE COURT: And is denied as well, yes, sir.

Although the parties had earlier stated that they did not want a jury poll, the judge nevertheless polled the jury after this hearing. Each juror affirmed the verdict as his or her own.

We doubt that Balderas's brother's conduct of waving and smirking at the jurors as their bus passed him on a public street constituted "contact . . . about the matter pending before the jury."[97] The fact that some jurors recognized Balderas's brother because he had been a spectator in the courtroom did not necessarily transform his conduct of waving and

---

[97] *Cf. Romo v. State,* 631 S.W.2d 504, 506 (Tex. Crim. App. 1982), *overruled on other grounds by Cockrell v. State,* 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (describing police officer's joking comment to juror, "They're all guilty," as a "rank generality directed towards all defendants" that did not merit a new trial).

smirking into a communication about the case.[98] Thus, the testimony presented at the hearing did not establish that the contact at issue was "about the matter pending before the jury."

Further, the contact at issue was not particularly threatening or intrusive, and the evidence before the trial court rebutted any presumption of harm. Deputy Henning informed the court and the parties that five or six jurors had seen Balderas's brother waving, and they had made everyone on the bus aware of this incident. Nevertheless, defense counsel questioned only two jurors, "A.B." and "D.T." Both jurors indicated that their feelings about the incident did not affect their deliberations at the guilt phase and would not affect their deliberations at the punishment phase. In light of the evidence and arguments presented at the hearing, the trial court did not abuse its discretion by overruling the motion for mistrial.

Moreover, the record does not support Balderas's speculation that the jurors were deadlocked before the incident, but then, on the morning after the incident, those who favored a not-guilty verdict were so fearful that they abandoned their positions and returned a guilty verdict "to escape the situation." Rather, the record reflects that before the incident, around 3:30 p.m. during jury deliberations, the court received a note from the jury that stated, "We agreed that we are not to 'strongarm' each other to change votes and have exhausted our questions over testimony and evidence. Now what?" The trial judge stated that she would

---

[98] *See, e.g.*, *Maldonado v. State,* 507 S.W.2d 206, 208 (Tex. Crim. App. 1974) (noting that co-defendant's testimony that he saw two jurors speaking with deceased's brother did not signify that a juror had "conversed with any person in regard *to the case*").

give the jury an *Allen* charge.[99] Balderas objected, stating that the jury had been deliberating for about fourteen hours and had sent out numerous notes requesting "read backs" of the trial testimony, which indicated that the jury had already given "careful attention" to "this matter." Defense counsel asserted that the *Allen* charge would "have a coercive effect and violate [Balderas's] due process right and his right to a fair trial, . . . under the State Constitution, under the Code of Criminal Procedure, and . . . under the U.S. Constitution, under the Sixth and Fourteenth Amendments." Despite his objections at trial, Balderas does not complain about the *Allen* charge in this appeal. At 3:50 p.m., the judge read the *Allen* charge to the jury. The jury resumed deliberations at 3:55 p.m. and continued deliberating until 5:00 p.m.

At 5:00 p.m., the jury entered the courtroom. In response to a written request the jury had submitted, the trial court provided the jury with a typed list of the witnesses in their order of appearance. The judge also read back witness testimony in response to two previously submitted jury notes. These read backs included Karen Bardales's description of the gunman and his clothing, and Officer Cunningham's testimony concerning Wendy's statement to the effect that she had never seen the gunman before. After providing this testimony, the judge excused the jury for the day. The incident involving Balderas's brother occurred as the jurors were traveling by bus to the hotel where they were sequestered.

---

[99] *See Allen v. United States,* 164 U.S. 492 (1896) (permitting a supplemental jury instruction that reminds the jury that if it is unable to reach a verdict, a mistrial will result, the case will still be pending, and there is no guarantee that a second jury would find the issue any easier to resolve); *Barnett v. State,* 189 S.W.3d 272, 277 (Tex. Crim. App. 2006).

The jury resumed deliberations at 8:50 the following morning. At 10:00 a.m., the jury entered the courtroom and the judge read back testimony in response to three jury notes. These read backs included Diaz's testimony concerning: (1) the LTC gang's practice of sharing guns before its members learned that they could buy weapons at gun shows, the identities of the gang members who purchased weapons at a gun show, and the types of guns purchased for Balderas; (2) whether the gun identified as the murder weapon was the gun that Balderas regularly carried; and (3) Diaz's and Balderas's roles in founding the BTA subset of the LTC gang. After these read backs, the jury continued deliberating. It returned a verdict around 11:20 a.m.

Thus, the record shows that, after the jury announced that it had exhausted its questions over testimony and evidence, the trial court provided read backs in response to five jury notes and the jury deliberated for approximately three hours before reaching a verdict. This record does not support Balderas's speculation that, as the result of fears generated by an outside influence, jurors abandoned their views in order to reach a verdict quickly.[100] The trial court did not abuse its discretion by overruling Balderas's motion for a mistrial. Point of error seven is overruled.

### WITNESS'S IDENTIFICATION OF BALDERAS

---

[100] *Cf. Howard,* 941 S.W.2d at 121-22 (stating that the jury's request for transcript information and its inquiry about other evidence "rationally indicated ongoing deliberation.").

In point of error eight, Balderas asserts that the trial court's failure to suppress Wendy's in-court and out-of-court identifications of him deprived him of due process of law. Specifically, Balderas complains that the photo lineup containing his photograph was improperly suggestive and that Wendy's identifications of him that resulted from that lineup were unreliable.

Balderas notes that, in a hearing on his motion to suppress Wendy's identifications, Dr. Roy Malpass testified as an eyewitness identification expert and expressed concerns about the identification procedures employed in this case. Balderas also identifies inconsistencies between Wendy's statements and other evidence concerning the details of the offense. Further, he asserts that, because he and Wendy were acquainted before the offense, it is not plausible that she would fail to recognize the shooter when she spoke with police on the night of the offense but would then recognize Balderas and identify him as the shooter when shown a photo lineup containing his picture a few days later. Balderas also complains that Wendy's confident identification of Balderas when she viewed that lineup a second time was the result of impermissible police "prompting."

Generally, the Constitution protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting its introduction, but by affording the defendant the means to persuade the jury that the evidence should be discounted as unworthy of credit.[101] The Due Process Clause bars the admission of identification evidence only when

---

[101] *Perry v. New Hampshire,* 132 S. Ct. 716, 723 (2012).

the introduction of such evidence "is so extremely unfair that its admission violates fundamental conceptions of justice."[102]

The defendant has the burden to establish by clear and convincing evidence that the pretrial procedure was impermissibly suggestive.[103]  Further, an unnecessarily suggestive pretrial identification procedure does not, in itself, intrude upon a constitutionally protected interest.[104]  If the court determines that a pretrial identification procedure was impermissibly suggestive, it then assesses the reliability of the identification under the totality of the circumstances.[105]  The court assesses reliability by weighing five non-exclusive factors against the corrupting effect of any suggestive identification procedure:  (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.[106]

On appeal, in reviewing the trial judge's assessment of reliability, we consider these factors, which are issues of historical fact, deferentially in a light favorable to the trial court's

---

[102]  *Id.* at 723 (quoting *Dowling v. United States,* 493 U.S. 342, 352 (1990)).

[103]  *See Barley v. State,* 906 S.W.2d 27, 33-34 (Tex. Crim. App. 1995).

[104]  *Jackson v. State,* 657 S.W.2d 123, 130 (Tex. Crim. App. 1983).

[105]  *Luna v. State,* 268 S.W.3d 594, 605 (Tex. Crim. App. 2008).

[106]  *Id.*

ruling.[107]  We then weigh them *de novo* against any "corrupting effect" of the suggestive

pretrial identification procedure.[108]  We review the evidence adduced at the admissibility

hearing as well as the evidence adduced at trial.[109]

In Wendy's statement to Officer Cunningham, before she viewed any photo array, she

described her observations of the gunman as follows:

> I got a good look at his face.  I have never seen him before.  He was Hispanic
> and about 16-17 years old.  He was around 5 foot 5 inches to 5 foot 7 inches
> tall.  I remember him having a dark birth mark on his face but I can't
> remember exactly where.  He was very skinny and clean shaven.  He had black
> hair, it was short.  He had a fade type haircut.  He was wearing a black sweat
> shirt hooded jacket and khaki pants.

In the same statement, Wendy also described the gunman as "a skinny Hispanic guy dressed

in a black hooded sweatshirt type jacket."

Based on Wendy's description and information obtained during an ongoing police

investigation of other LTC-related offenses, Ruland initially showed Wendy a photo array

of six suspects that included Diaz but not Balderas.  Wendy recognized Diaz as an

acquaintance, but she stated that he was not the gunman.  She did not identify anyone in that

array as the gunman.

Following a tip from a confidential informant, Ruland obtained a photo array that

included Balderas.  This array had been prepared by a different police officer, based on a

---

[107]  *Ibarra v. State,* 11 S.W.3d 189, 195 (Tex. Crim. App. 1999).

[108]  *Loserth v. State,* 963 S.W.2d 770, 773-74 (Tex. Crim. App. 1998).

[109]  *Webb v. State,* 760 S.W.2d 263, 272 n.13 (1988).

different witness's description, during the investigation of another offense in which Balderas was a suspect. While it might have been a better practice to create a new photo array that was specific to Wendy's description of the gunman, Ruland's use of a pre-existing photo array did not, by itself, render the identification procedure unnecessarily or impermissibly suggestive.

On December 12, five days after Wendy viewed the first photo lineup containing Diaz's photograph, Ruland showed her this second photo array containing Balderas's photograph. Wendy recognized Balderas as an acquaintance and stated that "his face looked like" the gunman's face. Ruland asked her what she meant, and she reiterated that Balderas's "face looked exactly like the shooter's face." Seeking clarification, Ruland asked Wendy specifically if Balderas was the shooter, but she repeated that Balderas's face "looked exactly like," and was the "exact same face," as the shooter's face. She added that Balderas "could be the shooter." Wendy confirmed her identification of Balderas as the gunman by signing and dating his photograph.

Based on Wendy's demeanor, Ruland felt that she was positive in her identification of Balderas as the gunman, but he remained confused by her phrasing, a result he believed was based on his impression that English was Wendy's second language. It was department practice to make a written note classifying the witness's identification of a suspect as "negative," "tentative," or "positive" after showing a witness a lineup. However, after

Ruland left Wendy's apartment, he did not make a written classification because he did not feel comfortable classifying Wendy's identification as an "absolute positive identification."

After speaking with someone in the district attorney's office about his conversation with Wendy, Ruland returned to her apartment on December 13, seeking to further clarify her confidence level in her identification of the gunman. Upon viewing the photo array again, Wendy reiterated that Balderas and the gunman had the "same face." She explained that she was describing the photo as the "same face" because the gunman had been wearing a hood. Ruland asked her to look at the photos again, this time using her hands to cover the hair of each subject. Wendy complied and moved her hands from photo to photo as she viewed them. Ruland observed that, when Wendy covered Balderas's hair with her hands, her eyes "grew wide" and "began to water." She covered her mouth and said that she was absolutely positive that the man in the photograph was the man who killed Hernandez. Ruland asked her to note her positive identification by writing on the back of the photograph. Wendy explained that she could write better in Spanish than in English and asked Ruland if she could write in Spanish. Ruland assented, and Wendy wrote two sentences on the back of the photo: "Yo estoy positiva que el es que mato a Eduardo," and "Yo si puedo entender el Ingles pero no lo puedo escrivir." The reporter's record reflects that, translated into English, these sentences read, "I'm positive that he's the one that killed Eduardo," and, "I can understand English but I can't write it." From Wendy's request to write in Spanish, Ruland surmised that his confusion over the certainty of her December 12 identification

could have been due to her lack of English proficiency. After the December 13 conversation, Ruland felt confident that Wendy had positively identified Balderas as Hernandez's killer.

Dr. Malpass testified that the photo array was suggestive because, unlike the other individuals in the array, Balderas had a "distinct mark" on his left cheek. He noted that "the most egregious problem" was that Balderas was the only person in the array who was wearing a black hoodie. Malpass also stated that three of the other individuals had haircuts that were "very much shorter, very distinct from [Balderas's]."

Concerning Wendy's ability to identify a suspect, Malpass testified that it was "a possibility" that Wendy's prior acquaintance with Balderas could have caused her to make an honest mistake in identifying the gunman "because of facial similarities." Malpass also noted that a possible "weapon focus" during the offense might have "interrupt[ed]" Wendy's "attention to the face," thus adversely affecting her ability to form a memory of the gunman's face. Similarly, Wendy described herself as being "in shock" during and immediately after the offense, and Malpass theorized that the stress that Wendy was under could have reduced her ability to form a clear memory.

Malpass also expressed concern about the fact that Wendy's identification of Balderas evolved over time. Malpass stated that earlier identifications tend to be more reliable than later ones. He testified that viewings of successive photo arrays would increase the possibility of "memory contamination." Such contamination would interfere with a witness's

ability to recall an accurate picture of the suspect, and, as a result, would undermine the reliability of her later identification.

Malpass testified that Wendy's first identification was "no identification." Malpass was concerned about the fact that Wendy was more certain in her identification of Balderas the second time she viewed the array containing his photograph. He theorized that Ruland's act of returning with the array a second time would have conveyed a signal to Wendy that her first identification was not good enough, so that she might have felt pressured to provide a more positive response.

On cross-examination, Malpass acknowledged that he did not know what was going through Wendy's mind the second time she viewed the array containing Balderas's photo. He also clarified that he did not purport to opine on the accuracy or reliability of Wendy's identification of Balderas as the gunman. Rather, he described factors affecting the accuracy or reliability of a witness's identification, and he discussed more specifically the factors that were in play in this case.

At the end of the hearing on the motion to suppress, the trial court found that the photo array was not impermissibly suggestive. Specifically, the trial court observed: "[T]he suspect did not stand out in the six-photo photo array, all subjects were male, they were all light-skinned Hispanic males, they were all of the same general build, all of the same general age range, all had short haircuts."

On appeal, Balderas complains specifically that the photo array was impermissibly suggestive because he was the only person in the photo array with a mark on his face, and he was the only person wearing a hoodie. As such, Balderas asserts, he was the only person in the array who closely resembled Wendy's description of the suspect.

A pretrial lineup may be impermissibly suggestive if the suspect is the only individual in the array who closely resembles the pre-procedure description.[110] However, lineup participants need not be identical to satisfy due process requirements.[111] In *Luna*, we rejected the complaint that a photo lineup was unnecessarily suggestive, where Luna asserted that other men in the lineup had "notably fuller faces" than him and that "[t]he one glaring difference is that [the appellant] appears to be either totally bald, or to have had his head clean shaven."[112] We reasoned that, because the witness described the suspect as wearing a cap, hair length was not necessarily a determinative factor.[113] By contrast, in *Bell v. State* we seemingly acknowledged that a live lineup was unnecessarily or impermissibly suggestive where the appellant was the only person in the six-member lineup wearing bright white pants,

[110] *Barley,* 906 S.W.2d at 33.

[111] *Luna,* 268 S.W.3d at 607-08.

[112] *Id.* (alterations in original).

[113] *Id.* at 608.

he was the tallest of the group, and, unlike the other subjects' number cards, appellant's number card featured a number that was underlined and had a triangle mark over it.[114]

In this case, the photo array containing Balderas's photograph more closely resembles the lineup in *Luna* than the lineup in *Bell*. All of the photographs are "head shots" depicting Hispanic males who could be about 16 or 17 years old. Nothing in the photographs reveals the men's relative heights and weights. Four men are wearing black or dark grey shirts: one has a black t-shirt, another has a black sweatshirt or polo shirt, another has a grey hoodie, and Balderas has a black hoodie. Balderas's and the other man's hoodies are clearly off of their heads and behind their necks. All of the mens' faces are clearly visible. The men in the photographs are generally clean shaven, although one has a sparse mustache. No one in the array appears to have a "dark birth mark" on his face. Balderas has a mark on his cheek that appears to be a scratch, and two other men have marks on their faces that appear to be scratches or scars. All of the men have very short hair, and two men in addition to Balderas have haircuts that can fairly be described as "fade type."

Thus, notwithstanding Malpass's testimony detailing problems in the composition of the photo array, as well as possible adverse influences on Wendy's memory, Balderas has not established that the procedure that led to Wendy's initial identification of him as the gunman was unnecessarily or impermissibly suggestive.[115] The record supports the trial court's

---

[114] *Bell v. State,* 724 S.W.2d 780, 798-99 (Tex. Crim. App. 1986).

[115] *See Luna,* 268 S.W.3d at 607-08.

determination that the pretrial identification procedure leading to Wendy's initial identification of Balderas was not impermissibly suggestive.[116]

After finding that the identification procedure was not impermissibly suggestive, the trial court stated, in the alternative, that there was no substantial likelihood of misidentification: "[T]he Court further finds that the totality of the circumstances reveals no substantial likelihood of misidentification . . . and that the identification testimony is deemed reliable after reviewing the five factors set out in *Webb* [*v. State*] . . . ."

The *Biggers* factors—used to determine the reliability and admissibility of an in-court identification after an impermissibly suggestive initial identification—are historical facts and should be viewed deferentially to the trial court's ultimate conclusion.[117] When the trial court does not make express findings of historical facts, we view the facts in a light favorable to the court's ruling.[118] "The factors, viewed in this light, should then be weighed *de novo* against the 'corrupting effect' of the suggestive pretrial identification procedure."[119] An appellate court does not consider each *Biggers* factor *de novo*.

In considering the five factors, we note that Wendy testified that her eyes followed the gunman the entire time he was in the apartment, and she was focused on him throughout the

---

[116] *See Perry,* 132 S. Ct. at 728.

[117] *Loserth*, 963 S.W.2d at 773.

[118] *Id.* at 774.

[119] *Id.* at 773-74.

offense.  Although the living room light was off, the television in the living room was on and the kitchen light illuminated the area.  Wendy testified that she could see the gunman as he ran through the apartment.  The gunman initially wore a hood pulled up over his head, but the hood fell as he passed Wendy, and she got a good look at his face.  Wendy's description of the gunman in the statement she provided to Cunningham was generally consistent with Balderas's appearance, but unlike her description, he did not have a "dark birth mark" on his face.  Wendy did not recognize the gunman on the night of the offense, but she identified Balderas as soon as she saw the photo array containing his picture and stated that his face "looked exactly like" the gunman's face.  She first viewed this photo array five days after the offense.  Weighing these factors against any corrupting effect of the identification procedure, if any, we agree with the trial court's conclusions in light of its implied factual findings.

Arguably, these five factors are not a perfect fit for a situation like this one, where the eyewitness initially stated that she did not recognize the gunman, but later, upon viewing a lineup, recognized an acquaintance and identified him as the gunman.  However, Balderas's broad assertions that this scenario is simply not plausible, and therefore Wendy must have been telling the truth when she initially failed to recognize the gunman and must have been lying when she later identified Balderas as the gunman, do not persuade us that the identification was, under the totality of the circumstances, unreliable.[120]  The trial court did

---

[120]  *See Perry,* 132 S. Ct. at 723, 728 (favoring admission of evidence so that the jury rather than the judge may determine its reliability).

not err by determining that Wendy's initial identification of Balderas in the pretrial lineup was admissible.

To the extent that Balderas asserts that Wendy's certainty in her second identification of him was the product of police "prompting," we observe that Wendy had already identified Balderas as the gunman by that time. Her greater certainty in her second identification did not undermine its reliability. However, to the extent that Balderas means to say that Wendy's second pretrial identification of him tainted her in-court identification, we will address the matter more thoroughly.

Due process requires the suppression of an in-court identification only if (1) an impermissibly suggestive out of court procedure (2) gave rise to a very substantial likelihood of irreparable misidentification.[121] It may be that showing Wendy the photo lineup a second time was potentially suggestive, but it did not present a substantial likelihood of misidentification because Wendy had already identified Balderas as the gunman by then.[122]

During her trial testimony, Wendy pointed to Balderas when she identified him, based on their previous acquaintance, as someone she knew to be a member of the LTC gang. When she recounted the offense, she related that "someone" wearing a black hoodie ran

---

[121] *Williams v. State,* 937 S.W.2d 479, 488 (Tex. Crim. App. 1996).

[122] *Cf. Luna,* 268 S.W.3d at 608 (noting that officer's comment that witness identified "the right guy" may have been suggestive, but it was not so suggestive as to present a very substantial likelihood of misidentification with respect to the witness's in-court identification).

around the apartment, shooting. She acknowledged that she did not recognize that person during the offense or later that evening when she spoke with police.

Wendy also testified that she recognized the gunman when she viewed the photo array containing Balderas's photograph. She stated that she signed and dated the photograph of "the one that killed Eduardo [Hernandez]." Wendy testified that the person in that photograph was Balderas, who was the same person she had pointed out earlier in the courtroom. She then confirmed that Balderas was "the one who shot Eduardo [Hernandez]."

Because Wendy had identified Balderas as the gunman before Ruland showed her the photo array a second time, and because Wendy's in-court identification of Balderas was based on, and cumulative of, her observations of the gunman at the crime scene as well as her previous identifications, the trial court did not err by admitting Wendy's in-court identification of Balderas. Point of error eight is overruled.

## JURY'S REQUESTS TO HAVE TESTIMONY READ BACK

In point of error nine, Balderas asks, "Did the trial court abuse its discretion by failing to have testimony read back in response to two jury notes?" Balderas observes that the jury sent two notes requesting to hear a portion of Ruland's testimony concerning Wendy's credibility, but the trial court responded to both notes by instructing the jury to be specific as to the point in dispute. After the court's second response, the jury did not submit a third note concerning the matter. Balderas appears to argue that, by failing to read back the requested testimony, the trial court violated Article 36.28, thereby depriving the jury of the

means to resolve their dispute in his favor and unnecessarily bolstering the State's case. Balderas states that, because Wendy was the only eyewitness who saw the gunman's face, her credibility was of the utmost importance, and it was crucial that jurors be provided the means to settle their dispute regarding Ruland's opinion of Wendy's credibility.

Article 36.28 provides: "In the trial of a criminal case in a court of record, if the jury disagree as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other."[123] This statute seeks to balance the concern that the trial court not comment on the evidence with the need to provide the jury with the means to resolve any factual disputes it may have.[124]

When the jury asks that certain testimony be re-read, the judge must first determine if the request is proper under Article 36.28.[125] A simple request for testimony is not, by itself, a proper request under Article 36.28.[126] Instead, the jury's "request must reflect that the jurors disagree about a specified part of the testimony."[127] Article 36.28 does not require that

---

[123] TEX. CODE CRIM. PROC. art. 36.28; *see Moore v. State,* 874 S.W.2d 671, 673 (Tex. Crim. App. 1994).

[124] *Howell v. State,* 175 S.W.3d 786, 790 (Tex. Crim. App. 2005).

[125] *Id.* at 790.

[126] *DeGraff v. State,* 962 S.W.2d 596, 598 (Tex. Crim. App. 1998).

[127] *Howell,* 175 S.W.3d at 790.

the jury use any particular words to express its disagreement.[128] Whether a disagreement exists will depend upon the particular facts of each case, and the judge's inference of a dispute need only have some basis other than mere speculation.[129] After determining that the jury's request is proper under Article 36.38, the trial court must then interpret the communication; decide, in its discretion what sections of the testimony will best answer the query; and limit the testimony accordingly.[130]

The record reflects that the jury initially sent the following note: "We would like to hear when the defense asked Officer Rutland if he would question Wendy's credibility if she knew [Balderas] prior to the incident. [We] Would like the question and the officer's answer." The trial court responded: "There is no testimony in the record that is specifically responsive to the question you have asked. If you can explain the dispute that you have amongst yourselves, we may be able to find a responsive answer."

The jury later sent the following note: "We are trying to hear testimony where the witness was asked if Wendy's credibility would be different if there was evidence that her relationship with [Balderas] was more involved." The trial judge stated that she would instruct the jury to be specific as to the point in dispute. Defense counsel objected, arguing that the court should read back the following exchange between defense counsel and Ruland:

---

[128] *Id.* at 793.

[129] *Id.* at 792-93.

[130] *Iness v. State,* 606 S.W.2d 306, 314 (Tex. Crim. App. 1980).

Q  When you talked with Wendy, when did she say it was the last time she'd seen [Balderas] before this incident?

A  I believe that it was approximately six months before.

Q  Okay.  But if she had later said to investigators or testified that it was two weeks prior to the incident, would that cause you to question her credibility or her veracity?

A  Yes.

The prosecutor argued that this testimony was not responsive to the jury's question because it did not concern the nature of Wendy's and Balderas's prior relationship but instead merely concerned the last time Wendy saw him.  She stated that reading back this testimony could cause confusion.  The trial court overruled the defense's objection and provided the following written response to the jury:  "Please be specific as to your point in dispute."  The jury did not follow up with a third note concerning the matter.

On appeal, we review the trial judge's conclusion as to whether there is a factual dispute between the jurors for an abuse of discretion.[131]  We apply this same standard in reviewing the trial court's selection of testimony responsive to the jury's request.[132]  "A trial judge abuses his discretion when his decision is so clearly wrong as to lie outside the zone within which reasonable persons might disagree."[133]  The test for abuse of discretion is not

---

[131]  *Howell,* 175 S.W.3d at 790.

[132]  *See, e.g.*, *Brown v. State,* 870 S.W.2d 53, 56 (Tex. Crim. App. 1994); *see also Iness,* 606 S.W.2d at 314.

[133]  *Howell,* 175 S.W.3d at 790.

whether, in our opinion, the facts present an appropriate case for the trial court's action; rather, the question is whether the trial court acted without reference to any guiding rules or principles.[134]  Further, we will not disturb the trial court's decision without a showing of both a clear abuse of discretion and harm.[135]

Our review of the record reveals that the trial court's initial response to the jury, to the effect that there was no testimony responsive to the jury's request but that the court would attempt to find responsive testimony if the jury would explain the dispute, was reasonable. Ruland did not testify to whether his opinion of Wendy's credibility would have been affected by knowledge of a prior relationship between Wendy and Balderas.  The jury's second note, "We are trying to hear testimony where the witness was asked if Wendy's credibility would be different if there was evidence that her relationship with [Balderas] was more involved," reiterated the jury's request for testimony that was not in the record.  Ruland did not testify that his opinion of Wendy's credibility would have been different if he had known that her relationship with Balderas was "more involved."  Further, the jury's second note did not clarify the nature of any disagreement concerning Ruland's testimony.[136]

---

[134]  *Id.* at 792.

[135]  *Brown,* 870 S.W.2d at 55.

[136]  *Cf. Robison v. State,* 888 S.W.2d 473, 481 (Tex. Crim. App. 1994) (concluding that, after the jury made three separate requests for testimony on same topic, each becoming increasingly narrow in scope, the trial court did not abuse its discretion in determining that a dispute existed and submitting transcript of requested testimony).

On the facts of this case, the trial judge did not abuse her discretion by determining that Ruland's testimony was not responsive to the jury's request, by instructing the jury to explain its dispute, and by declining to read back Ruland's testimony. Point of error nine is overruled.

We affirm the trial court's judgment.

DELIVERED: November 2, 2016

PUBLISH