**Affirmed and Memorandum Opinion filed May 22, 2018.**



In The

# Fourteenth Court of Appeals

## NO. 14-16-00985-CR

**RYAN ABNER BURGS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 232nd District Court
Harris County, Texas
Trial Court Cause No. 1412867**

## M E M O R A N D U M   O P I N I O N

A jury rejected appellant's claim of self-defense and convicted him of murdering Juliana Gordon, the mother of his three children. The jury assessed punishment at eight years' confinement.

In a single issue, appellant challenges the sufficiency of the evidence for the jury's rejection of his claim of self-defense and the conviction for murder. Appellant admits that while he and Gordon were alone, he shot Gordon four times with a pistol

and fired a shotgun into her belly. Appellant testified that Gordon was threatening him with a knife. The State, however, presented evidence that Gordon was lying on the floor when she was shot.

We affirm appellant's conviction.

## I.      Standard of Review and Principles for Self-Defense

In a sufficiency review, we must consider all of the evidence in the light most favorable to the jury's verdict. *Balderas v. State*, 517 S.W.3d 756, 765–66 (Tex. Crim. App. 2016). We defer to the jury's responsibility to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* at 766. The jury is the sole judge of the credibility and weight to be attached to witness testimony, and we must defer to the jury's resolution of conflicting inferences that are supported by the record. *See id.*

An actor is justified in using deadly force if, among other things, the actor reasonably believes deadly force is immediately necessary to protect the actor against another's use or attempted use of unlawful deadly force. *See Morales v. State*, 357 S.W.3d 1, 4 (Tex. Crim. App. 2011) (citing Tex. Penal Code § 9.32(a)(2)(A)). A defendant has the initial burden to bring forth evidence in support of a claim of self-defense. *See Dearborn v. State*, 420 S.W.3d 366, 372 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)). Once this burden is met, the State must disprove the defense beyond a reasonable doubt. *Hernandez v. State*, 309 S.W.3d 661, 665 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Zuliani*, 97 S.W.3d at 594). A jury's verdict of guilty is an implicit finding rejecting the defendant's self-defense theory. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

Accordingly, when an appellant challenges the sufficiency of the evidence to support the jury's rejection of self-defense, we must determine whether any rational trier of fact could have found beyond a reasonable doubt (1) the essential elements of the alleged offense, and (2) against appellant on the self-defense issue. *See Dearborn*, 420 S.W.3d at 372. "Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Saxton*, 804 S.W.2d at 914.

## II.  Evidence

Appellant and Gordon had an on-again, off-again relationship. They had three children together. At the time of Gordon's death, the children were all under the age of seven, and appellant had primary custody of them. Over Christmastime in 2013, the children had been staying with Gordon at Gordon's mother's house. On Saturday, December 28, appellant picked up the children and Gordon from the mother's house in Katy. They went to appellant's house in East Houston, nearly forty-five miles away. They planned for Gordon to spend two nights there, for the children to stay at appellant's parents' house on Sunday night, and for appellant to drive Gordon back to her mother's house on Monday after he got off work.

Appellant testified that Gordon surprised him Saturday night with a thoughtful Christmas gift. He had not gotten one for her, so later he found a gift card in his wallet, wrapped it in tissue paper, and gave it to her. She was not happy with this gift.

Appellant testified that they had Bible study with the children in the home on Sunday morning. During Bible study, appellant and Gordon had a verbal altercation. Gordon collected her things and left the house on foot at about noon. Appellant

3

loaded the children into his truck and set out to look for her. He was unsuccessful and returned home.

Text messages between appellant and Gordon from that afternoon were admitted into evidence, as were text messages between Gordon and her mother and between Gordon and her friend (and former lover) Joseph Laesser. Appellant and Gordon exchanged about eighty-five messages that afternoon. In summary, the messages show that Gordon was angry at appellant for the way he treated her. Gordon told appellant that she was walking home because appellant told her to leave. He told her multiple times that he loved her, and he tried to persuade her to come back. But Gordon told appellant that she hated him. She told him to not give her a second thought because she was a bum and a loser. At one point, she said, "If I get run over by a car and die... maybe then you'll be satisfied. I hope I do." She also told appellant that she was not his "Molly maid robot." Towards the end of the exchange, she said, "You do this every wk b/c I let you. It stops today. I am not repeating the past 8 yrs of my life over and over b/c you wna have your cake and eat it too and capitalize of my misfortune."

Among other messages, Gordon and her mother exchanged the following messages during the same time period:

| Mother: | It's a long walk home. Please call someone. |
| Gordon: | I don't want to. I've finally gone crazy. Congratulations! |
| . . . . | |
| Mother: | I'm calling the police! |
| Gordon: | Go ahead. What else is new. |
| . . . . | |
| Mother: | Ryan is driving around looking for you. He packed up the boys. Where are you? |
| Gordon: | Idc mom. Just please leave me alone. I wna be alone. |

| Mother: | Do your want to get killed? You both need counseling. He does love you, honey. |
|---|---|
| Gordon: | He doesn't love me. He is Satan's spawn. He is evil and combative. I try to hold it together and I can't anymore. It wld prob be best for everyone if I were to get killed. At least I wldn't be such a failure anymore. Maybe then ppl will have nice hints I say. |
| Gordon: | *things |

During the same time period, Gordon had been texting with Laesser and asked him for a ride, which he could not provide.

Appellant testified that around this time in Gordon's life, Gordon felt that her life was in a low state and that she did not have it together. Gordon's friend, Melissa Hayes, testified that Gordon did not have "stability in home" for three or four years prior to her death. Gordon, from time to time, had lived with Hayes, Gordon's mother, Gordon's father, appellant, and a man Gordon knew from work. Hayes testified that Gordon's job situation was much like her home situation for the last three or four years of her life. Hayes testified that Gordon was upset that appellant had primary custody of the children.

Ultimately, Gordon returned to appellant's home and hid in his truck until she texted appellant her location. Appellant testified that Gordon came inside for dinner. James Roberts a.k.a. "Buster" was Gordon's friend and had been intimate with Gordon several times. He testified that he called Gordon at about 6:00 p.m. that evening, and somebody picked up, but nobody said anything. He thought it was unusual because Gordon always had something to say when he called. He called back right away and spoke to Gordon, but her demeanor was different than usual, as if she couldn't talk—as if somebody was standing right next to her.

Gordon sent appellant text messages a few minutes after the call from Roberts:

Gordon:     If you wld've stayed you wlda heard him call bk and explain that he hung up b/c all he heard was static.

Gordon:     But of course you wld never stay…you never do…

Gordon:     Buster and I never talk and he never calls. He's just a friend from hs, nothing more.

Gordon:     What a coincidence he called at the exact moment I was crying. God listens.

Despite these messages, appellant testified that it would not have bothered him at all if another man was calling Gordon, and it would not have been upsetting to appellant if Gordon had relationships with other men. Appellant testified that he was not sure about whether he was present when Roberts called, that appellant did not know what Gordon was talking about regarding Buster, and that he did not know who "Buster" was. Appellant testified that he was not in a relationship with Gordon, though she was trying to be in a relationship with him.

Appellant testified that he left the house at about 8:00 p.m. to take the children to his parents' house. Meanwhile, Hayes spoke with Gordon on the phone for an hour beginning at about 8:00 p.m. Hayes described Gordon as upset, but not angry.

Appellant testified that he stopped on the way home to get Gordon a greeting card, some chocolate, and ice cream. He had a receipt for the items, purchased at 10:33 p.m. He wrote in the card, "I'll always love you no matter what." He testified that she was happy with the gifts, and she was in a better mood as she had taken a shower while he was gone. He testified that they began playing dominos. She was drinking beer, and an autopsy later confirmed she had been drinking recently before her death with ethanol in her blood measuring .07.

Appellant testified that Gordon's mood changed as she kept "going back to the prior day and Instagram." Appellant testified that Gordon had seen some Instagram photos of appellant's former girlfriend, to whom appellant had given a

6

puppy and jewelry. Gordon expostulated with appellant regarding the gift card that he had given Gordon the day before, saying things such as, "I gave you three kids and you gave me a F'ing gift card and you gave that fat bitch a puppy." She was saying "F you and F this" and "I'm sick of this S or shit." Appellant testified that Gordon went to the kitchen and grabbed the biggest knife she could find.

Appellant testified that he picked up a bar stool to defend himself against Gordon's approaching with the knife. She was saying "F you. You're a bitch. Bitch nigga." Appellant testified that while he used the bar stool to block her, he was able to reach his pistol in a kitchen drawer. He dropped the stool, and it broke. He then fired a shot into the floor, but she just got madder. He ran upstairs to his bedroom, shut the door, and put his feet up against it to hold it. She banged on the door for about fifteen seconds, yelling profanities. When she went back downstairs, appellant remembered that his shotgun was located in the laundry room, right next to his bedroom. He retrieved the shotgun and walked down the stairs.

Appellant testified that Gordon met him at the bottom of the stairs and started to come at him with the knife. He chambered a round and pointed the shotgun at her chest. She said, "Shoot me with that bitch then," and, "Hit me with that ho." She pushed her chest up against the barrel of the shotgun, and he pushed her back. She stumbled, and he retreated back to his bedroom. Appellant testified that he sat on his bed for up to ten minutes. He testified that he did not call the police because his phone was in the kitchen.

At 12:30 a.m., Gordon sent a text message to Hayes. It included a picture of Gordon's chest with a red circular abrasion, and text: "This nigga stuck a loaded shotgun in my chest... I told him to shoot that bitch." At 12:37 a.m., she sent a text message to Laesser, telling him goodnight.

7

Appellant testified that when he called out to Gordon from upstairs and asked her to leave the house, instead she came upstairs with the knife. She continued to tell appellant that she hated him, referring to him with profanities. Appellant sat on the bed, and Gordon stopped near the entrance to the bedroom. He testified that he had the pistol pointed at her, and she held the knife down, not in a raised position. He testified that he was terrified and told her that she was scaring him.

He testified that Gordon "jumped out," and with the first movement she made, he started firing the pistol. He claimed to have fired the pistol rapidly, for less than five seconds. Other evidence, discussed in detail below, showed that he fired the pistol four times, striking her with each shot. When the pistol jammed, he picked up the shotgun from the bed and shot her in the belly. He testified that she fell while leaning over, and she fell to the side. Appellant testified that he did not shoot Gordon while she was lying on the floor.

At about 12:45 a.m., appellant dialed 911 and admitted to shooting Gordon. An audio recording of the call was admitted as an exhibit. Appellant was emotional. A dispatcher told appellant to place Gordon flat on her back to attempt life-saving measures. When the first deputies arrived from the Harris County Sherriff's Office, Gordon was lying on her back.

An assistant medical examiner, Dr. Merrill Hines, conducted the autopsy and discussed the injuries to Gordon. The trial court admitted the following diagram as part of the autopsy report:



In total, Gordon had been shot four times with the pistol (causing wounds labeled A, B, C, D, E, and F) and once with the shotgun (causing wound G). Hines testified that the A and B wounds from the diagram were caused by the same bullet, which was lodged in Gordon's upper left shoulder. He testified that this bullet was likely one of the earlier ones to be fired because it caused significant bleeding and pooling to be deposited in the chest cavity, while other injuries—in particular, ones associated with the C and G wounds to her belly—caused less bleeding than expected.

Hines testified that another bullet likely caused the E and F wounds, and the bullet was lodged in Gordon's thigh. Hines found the bullet that caused the D wounds inside a pant leg of the jeans that Gordon was wearing. A shot cup and most of the pellets were found in Gordon's pelvic area. Hines testified that the pellets entered Gordon's body at a downward trajectory, as some of the pellets exited through the front of Gordon's pelvic area and then reentered the front of her pelvic area. To have received such injuries from the shotgun blast, Gordon could have been leaning forward when she was shot. Another possibility is that Gordon was on the floor, and appellant fired the shotgun while standing near her head.

Hines testified that the C wounds were caused by a bullet that entered Gordon's belly below her bellybutton and exited higher up through her back, puncturing the strap of her bra. A crime scene investigator with the Harris County Sheriff's Office, Deputy Joe Noguera, confirmed that it appeared Gordon had spent some time lying on her side based on the blood pooling on the floor, although she was lying on her back when deputies first arrived. Deputy Noguera testified that he extracted a bullet from the floorboard underneath Gordon's body. He testified that the bullet's location was consistent with the trajectory of the bullet that caused the C wounds.

Appellant's investigator, James Benford, was a forty-year veteran of the Houston Police Department and former homicide detective. He agreed with the State that the bullet that caused the C wounds to Gordon was the one Noguera removed from the floorboard. Both Noguera and Benford testified that they did not observe any bullet strikes in the walls or ceiling above where Gordon was shot.

Hines opined that the most likely position of Gordon's body when she was shot with the bullet that caused the C wounds was lying on her back. Noguera gave the same opinion. Noguera also noted that, although there was no blood stain where

10

the bullet entered the carpeted floorboard, there was a blood stain on the carpet further away from the bedroom, above where the bullet entered the floorboard. This stain was consistent with the shape of the back of Gordon's bra, which ultimately became soaked with blood from the C exit wound. Further, Noguera noted that Gordon's jeans had a bullet entry hole in the zipper area, although the C entry wound in her belly was above the waistband on her jeans at the time Noguera arrived. Because the bullet hole in Gordon's jeans did not line up with the C entry wound, Noguera believed that her jeans had slid down her waist several inches after she was shot. Based on the location of the bra-shaped blood stain and the bullet hole in Gordon's jeans, Noguera opined that Gordon was scooting backward away from appellant while on the floor after she was shot with the bullet that caused the C wounds.

Benford, on the other hand, opined that Gordon was not lying on her back at the time appellant shot her in the belly with the pistol. If Gordon were lying on the floor while shot, Benford would have expected to see blood around the bullet entry hole in the floor, but there was none. Benford noted that appellant was in a lower position compared to a standing Gordon because appellant had been sitting on the bed about fifteen inches off the floor. He testified that bullets frequently change course within the human body, and that human flesh is enough to change a bullet's direction.

Although Hines testified that it is not possible to determine the exact angle of a bullet traveling through the body, he testified that Benford's theory that the bullet changed direction to become imbedded in the floor was unlikely. Hines testified that nothing during the autopsy indicated that the bullet that caused these wounds changed its trajectory by, for example, striking bones in Gordon's ribs.

11

Benford also testified that he believed Gordon's jeans had been lowered by emergency medical technicians at the scene while they attempted life-saving efforts, although neither of the testifying technicians admitted to lowering Gordon's jeans.

Noguera testified about other aspects of the crime scene. For example, a knife was found near Gordon's body, but it did not have any blood on it. The door jamb for appellant's bedroom was missing a strike plate and screws, and the wood near that area had been pushed out and damaged. There were small pieces of wood on the floor consistent with the damaged door jamb. However, Noguera could not find the strike plate and screws. Noguera also testified about several bags found on the downstairs kitchen table. One of the bags had Gordon's wallet in it; another had a woman's nightie, underwear, and "unmentionables." A third bag had a shower scrunchie, shampoo, conditioner, and other toiletries.

The trial court admitted evidence concerning extraneous acts of violence by both Gordon and appellant. Appellant's father testified that while the couple was living with him, the father observed an incident when appellant had blood on his face and was defending himself from Gordon. The father observed Gordon pounce on appellant and start punching him repeatedly. The father described Gordon as "very aggressive."

Appellant's longtime friend and co-worker testified that Gordon had a reputation for getting "very mad very easily." The friend testified that Gordon would often push appellant, hit him, cuss at him, yell at him, and "absolutely use everything that she could to get under his skin to try and provoke him or get mad." Gordon would keep escalating the situation until they were separated. She would get mad at appellant for a wide variety of things. A lot of times she got mad over something little—"mostly girls," like if a girl waved at appellant or sent him a message on social media.

The friend testified about instances when Gordon would come to the workplace (a machine shop) very angry and would yell, curse, and push appellant. On one occasion, Gordon became really violent and pushed appellant up against a machine. She was trying to egg him on to get him to do something. When appellant persuaded Gordon to go outside and then locked her out of the workplace, she banged hard on the steel door for thirty seconds while cursing. Appellant had to lock her out of the workplace multiple times because she was very upset and angry. The friend also testified about another incident when Gordon had been upset about something and tried to ram appellant's truck with her car while appellant was reversing out of a parking space.

The State adduced evidence about an incident involving Laesser, which resulted in appellant being charged with burglary. Laesser, a convicted felon who was on probation at the time of trial, testified that he and Gordon had an intimate and physical relationship in early 2008. He testified that he and Gordon had sex in his mother's mobile home between midnight and 1:00 a.m. one night, and afterward appellant "busted in" the window. Laesser testified that appellant was wielding a pistol and threatened to shoot Gordon. Appellant fired the pistol several times outside of the home and then left.

A deputy who responded to the scene that night could not find any evidence of a firearm being discharged. But on the next day, Laesser found two shell casings and gave them to a deputy. Another deputy testified that the casings from the Laesser incident could not be identified or eliminated as being fired from the same pistol appellant used to shoot Gordon.

Laesser testified also that he had been charged with assaulting Gordon on one occasion, but that he had been on the receiving end of Gordon's violence. The assault

13

charge was dismissed because of mutual combat, although Laesser testified that the couple just had an argument and that there was nothing physical.

Gordon's sister testified that on the day of the incident involving appellant and Laesser in 2008, appellant had dropped off his oldest son with the sister in the afternoon. She testified that appellant returned a few hours later at about 6:00 p.m. or 7:00 p.m. and admitted that he had been stalking Gordon, went to Laesser's home, watched them have sex, punched out the window, and fired warning shots to scare them. His shirt and knuckles had blood on them.

The State stipulated that Gordon and appellant had been in a custody dispute over their oldest son at the time of the alleged burglary, that the burglary charge was dismissed, and that appellant obtained primary custody of the child.

## III. Analysis

The evidence recited above in support of appellant's claim of self-defense is merely consistent with the physical evidence at the scene. *See Saxton*, 804 S.W.2d at 914. The jury was free to reject appellant's testimony in support of his claim of self-defense. *Id.* Under such circumstances, the evidence cannot be insufficient because it was the jury's role to fairly evaluate the credibility of appellant's testimony and to resolve conflicts in the evidence. *See Balderas*, 517 S.W.3d at 766; *see also Saxton*, 804 S.W.2d at 914. Appellant cites no analogous authority that would suggest the evidence is insufficient to support the jury's rejection of appellant's claim of self-defense under these circumstances.

Furthermore, a rational jury could have determined that the State disproved appellant's claim of self-defense beyond a reasonable doubt based on physical evidence tending to show that Gordon was lying on her back during the shooting, contrary to appellant's testimony. There was no dispute at trial that the bullet

14

extracted from the floorboard had entered Gordon's body below the bellybutton and exited through her back and bra strap. In light of this evidence, the jury could have credited Hines's and Noguera's testimony that Gordon likely was on the floor, lying on her back when she was shot. This evidence contradicted appellant's testimony and supports a finding that appellant did not reasonably believe deadly force was immediately necessary to protect himself. *See Johnson v. State*, 452 S.W.3d 398, 403–04 (Tex. App.—Amarillo 2014, pet. ref'd) (holding that the jury's decision to reject self-defense claim hinged on the credibility of the witnesses when there was evidence that the defendant shot the complainant a second time while the complainant was lying on the floor); *see also Brown v. State*, 166 Tex. Crim. 345, 346 (1958) (sufficient evidence to support jury's rejection of self-defense claim when the last of several shots to the decedent occurred while the decedent was lying on his back on the floor).

Although the State was not required to prove motive, it is a circumstance relevant to guilt. *See Hacker v. State*, 389 S.W.3d 860, 870 (Tex. Crim. App. 2013). The State adduced evidence that appellant had been upset and violent towards Gordon in the past when she had been intimate with another man, despite appellant's testimony that he was not upset by Gordon's other relationships. Through text messages, Gordon attempted to downplay the phone calls from Roberts by saying Roberts was "just a friend from [high school], nothing more," and that they "never talk" and he "never calls." Throughout the day before her death, appellant had been telling Gordon that he loved her. But Gordon told appellant through text messages that she wanted to be done with their relationship. Indeed, Gordon's bags were packed and on the kitchen table. Despite appellant's claim that Gordon had taken a shower and was staying the night, her shower scrunchie, toiletries, and nightie were packed away. The jury could have inferred appellant had a motive to kill Gordon

based on Gordon's desire to leave appellant and her receipt of phone calls from a former lover.

After reviewing the entire record, we hold that a rational jury could have found that appellant knowingly caused Gordon's death and that appellant did not reasonably believe deadly force was immediately necessary to protect himself against Gordon's use or attempted use of unlawful deadly force. *See* Tex. Penal Code §§ 9.32(a)(2)(A), 19.02(b).

Appellant's sole issue is overruled, and the trial court's judgment is affirmed.

/s/     Ken Wise
        Justice

Panel consists of Chief Justice Frost and Justices Busby and Wise.
Do Not Publish — Tex. R. App. P. 47.2(b).

16