COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



THE STATE OF TEXAS,                 §

　　　　　　　Appellant,         §

v.                                                    §

GEORGE FRANK DIAMOS, III,   §

　　　　　　　Appellee.          §

　　　　　　　　　　　　　　§

No. 08-16-00322-CR

Appeal from the

120th District Court

of El Paso County, Texas

(TC# 20130D05419)

## **O P I N I O N**

The State of Texas appeals an interlocutory order granting the defendant's motion to suppress evidence of a pretrial identification. In the sole issue on appeal, the State contends the trial court abused its discretion in granting Appellee's motion to suppress because there was no evidence before the court to show that the identification procedure was impermissibly suggestive.

### **BACKGROUND**

On the day of his brother's murder, Charles Nami ("Nami") and his brother Saeed had woken up and smoked marijuana together around seven or eight o'clock in the morning. Sometime after that, the two decided to go visit a mutual acquaintance, Carlos, whom they had known for a little over a week. They met at Carlos's mother's home and went to an upstairs room to hang out. While upstairs, the three smoked marijuana. Nami later testified he smoked two

"bowls" of high grade marijuana known as "chronic." Sometime around 5:00 p.m., the brothers decided to leave to meet up with their older brother. On the way out, Carlos's mother called to the boys and offered them some chicken to take with them. Saeed, who was on the phone with his girlfriend at the time, declined the offer and continued walking to his truck but Nami accepted and waited by the front door for a plate.

While waiting for his chicken, Nami heard his brother call out to him but assumed he was urging him to hurry up so they could leave. Unknown to Nami, however, two men had approached Saeed and demanded he give them a backpack he was carrying. As Nami began walking over to his brother's truck he suddenly noticed the two men confronting his brother and saw that one of them was pointing an object at Saeed. At the time, he could not tell it was a gun. Realizing an altercation was occurring, Nami said "Yo, yo, what the fuck are you doing?" and as soon as he said this, the men shot his brother. The assailants jumped into their vehicle as Nami ran over. Nami reached into the vehicle and began fighting with the man in the passenger seat, attempting to take his gun. While struggling over the gun, Nami saw the second assailant in the backseat rummaging through the backpack they had taken from his brother. The person in the backseat looked up and shot at Nami through the window, then jumped into the driver's seat and sped away.

Detective David Flores of the El Paso Police Department took statements from Nami at the police station late that evening. In describing the perpetrators, Nami told Detective Flores, "I saw the passenger's face. I don't remember how he looked. Both were thug-looking. They were wearing light clothing, both looked around my age. I might have seen them wearing hats." After taking his statement, Detective Flores administered a photo lineup for Nami. Flores stated that

2

the police were able to generate the lineup based on a statement given to them by Carlos, who had identified two possible suspects. While reading the pre-lineup admonishments to Nami, Detective Flores let Nami know that he knew who the suspect was. After finishing the admonishments, Nami identified one of the men in the lineup. This man was not one of the suspects. Nami continued looking at the lineup after this first identification and subsequently circled the picture of the suspect, Appellant George Diamos. Diamos was charged with capital murder, attempted capital murder, and aggravated assault with a deadly weapon.

Diamos filed a pretrial motion to suppress Nami's identification, asserting that the State's methodology in obtaining the identification had been impermissibly suggestive. At the hearing, Nami testified that the assailants' vehicle had been parked on the street two or three vehicles back from his brother's truck. Nami walked to the middle of the street before seeing the men accosting his brother but had not seen them approach. He testified he had never seen either of the assailants before in his life. His testimony regarding the clarity of his view of the men was somewhat conflicting. Nami initially stated he was able to get "a real, real good, clear view" of the men as they accosted his brother, but then qualified this statement by saying his view was only sufficient for him to identify their skin color, clothing, and haircuts. He testified the men had short haircuts, and that the passenger—not Diamos—had been wearing a hat. Nami acknowledged he had smoked two bowls of marijuana an hour before the incident but claimed he had a high tolerance and the effect of the drug had dissipated by the time of the shooting.

Regarding the photo lineup provided by Detective Flores, Nami testified that the first person he picked from the lineup had been someone he had seen earlier that day but did not mean to identify him as the shooter. After circling this first suspect, Nami claims Detective Flores asked

3

him if he was positive that was who shot his brother and that he responded in the negative. He stated he told the detective he might have seen the person handing a bag of marijuana to Carlos earlier in the day. Nami claimed that a few seconds later, he circled Diamos's picture and asserted he was sure Diamos was the shooter. Nami recalled that the lineup took place around 2:40 a.m., and asserted he was no longer under the influence of marijuana at the time of the identification.

Detective Flores also testified at the hearing. Detective Flores confirmed Nami's description of the assailants had been limited to their approximate ages, clothing, skin color, and haircuts, and that Nami had further described them both as "thug-looking." Detective Flores testified the police had identified two possible suspects at the time of Nami's interview and that Flores was shown the suspects' names and "who they were." Because of his prior knowledge of the suspects' identities, he informed Nami he knew the identity of the suspect in the lineup. He stated he gave the standard form instructions to Nami regarding a photo lineup. He confirmed Nami had initially selected a different individual and that Nami claimed he merely saw the person earlier in the day and did not intend to identify him as the shooter. Detective Flores denied suggesting to Nami that Diamos was the suspect.

After listening to the arguments of counsel, the trial judge stated that the lineup was a bit problematic for her and requested further briefing and proposed findings from the parties. The trial court subsequently issued findings in which it concluded that while Nami had an adequate opportunity to observe the incident, he was impaired by his use of marijuana during the incident and that his description of the suspect was "very general and broad." It concluded that there was a substantial likelihood of irreparable misidentification of the defendant, and that the photo lineup had been impermissibly suggestive. It therefore granted Diamos's motion to suppress Nami's

4

identification.   This appeal followed.

## DISCUSSION

## Motion to Suppress Pretrial Identification

The sole issue on appeal presented by the State is whether the trial court abused its discretion in finding that the pretrial photo-lineup procedure was impermissibly suggestive and that there was a substantial likelihood of irreparable misidentification.   Specifically, the State contends Diamos failed to demonstrate by clear and convincing evidence that the procedure used by Detective Flores in administering the photo lineup was impermissibly suggestive.

### *Standard of Review*

We review a trial court's ruling on a motion to suppress evidence for abuse of discretion. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex.Crim.App. 2002).   In so doing, we "afford almost total deference to a trial court's determination of historical facts" when those facts are supported by the record, and we will uphold the trial court's decision if it is correct under any theory of law applicable to the case.   *State v. Stevens*, 235 S.W.3d 736, 739-40 (Tex.Crim.App. 2007); *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App. 1996).   Where the trial court does not make explicit findings of fact, we "review the evidence in a light most favorable to the trial court's ruling" and "assume that the trial court made implicit findings of fact supported in the record that buttress its conclusion."   *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex.Crim.App. 2000). Mixed questions of law and fact, or "ultimate facts," are reviewed de novo, provided the trial court did not resolve them based on an evaluation of credibility and demeanor.   *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997).

### *Applicable Law*

5

A defendant has the burden of establishing that a pretrial procedure was impermissibly suggestive by clear and convincing evidence. *Balderas v. State*, 517 S.W.3d 756, 792 (Tex.Crim.App. 2016). The test is whether, considering the totality of the circumstances, the procedure "'was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex.Crim.App. 1999)(*quoting Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). Improper suggestiveness may be created by the procedure used by the police in showing the lineup to the witness, such as where the police point out the suspect or otherwise suggest to the witness who the suspect is or that a suspect is included in the lineup or photo array. *Barley v. State*, 906 S.W.2d 27, 33 (Tex.Crim.App. 1995). If the identification procedures were suggestive, the question becomes whether, considering the totality of the circumstances, the procedures were so suggestive as to present a very substantial likelihood for irreparable misidentification. *Ibarra*, 11 S.W.3d at 196. This is determined by considering the *Biggers* factors: (1) the witness's opportunity to view the criminal act; (2) the witness's degree of attention at the time; (3) the accuracy of the suspect's description; (4) the level of certainty demonstrated at the time of confrontation; and (5) the amount of time between the crime and the confrontation. *Barley*, 906 S.W.2d at 34–35 (*citing Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)). These factors must be weighed against the corrupting effect of the suggestive identification procedures. *Id*.

### *Analysis*

We must first determine the proper level of deference to accord to the trial court's conclusions. The question of what deference to give a trial court's ruling on mixed questions

6

under *Guzman* can at times be difficult to discern.   The Court of Criminal Appeals addressed the issue in the context of a suppression hearing in *State v. Ross*, 32 S.W.3d 853 (Tex.Crim.App. 2000).   In *Ross*, the issue was whether probable cause to arrest existed in the context of a charge of public intoxication, with the sole evidence being the testimony of the arresting TABC agent. *Id*., at 854.   The testifying agent had been inspecting a local bar and noticed two children sleeping outside in a nearby pickup truck.   *Id*.   The agent went inside the bar and retrieved the owner because he was concerned the offense of endangering a child was being committed.   *Id*.   Bringing the owner outside to talk, the agent noticed he had bloodshot eyes, difficulty balancing, and his breath smelled of alcohol.   *Id*.   He then arrested him for public intoxication.   *Id*.   The owner filed a motion to suppress evidence surrounding his arrest due to a lack of probable cause and the agent testified to the preceding facts at the hearing.   *Id*.   The trial court granted the motion without entering findings of fact or conclusions of law.   *Id*.   The State appealed, arguing that there was no indication the trial court disbelieved the agent's testimony and, because his testimony was uncontroverted, the appellate court should presume the trial court concluded that the facts testified to were legally insufficient and should review that determination *de novo*.   *Id*., at 855. The court of appeals affirmed, reasoning that the trial court sustained the motion based on the credibility and demeanor of the witness.   *Id*., at 854.

The Court of Criminal Appeals granted review "to determine whether 'an appellate court may uphold a trial court's decision to suppress evidence as within its discretion, instead of *de novo*, because the trial court might have disbelieved some or all of the State's uncontroverted evidence.'" *Id*., at 854.   In concluding that it could, the court acknowledged that the typical motion to suppress case is reviewed under a bifurcated standard: almost total deference is given to a trial court's

express or implied determination of historical facts, and the court's application of the law to those facts is reviewed *de novo*. *Id*., at 856. It noted, however, that not every case is reviewed under this standard—in a situation in which the trial court's ruling rests entirely on the credibility of the witness, the determination is a mixed question of law and fact, the resolution of which turns on an evaluation of credibility and demeanor. *Id*. Thus, it concluded, the proper standard of review is "almost total deference" to the trial court ruling. *Id*. Applying this standard, it affirmed the ruling on the grounds that "[a]s the sole trier of fact and judge of credibility, the trial court was not compelled to believe the agent's testimony, even if uncontroverted, based on credibility and demeanor." *Id*., at 857.

Here, as the State argues, the question is not whether the photographic lineup itself was impermissibly suggestive but whether the way Detective Flores conducted the lineup—that is, the procedure—was. Nami and Detective Flores both testified that while Flores acknowledged to Nami he knew the identity of the suspect, he did not suggest who the suspect was. The trial court made the following findings of fact:

1. Charles Nami ('Nami') testified that on August 19, 2013 he was present at the crime scene.

2. Nami smoked marijuana twice that day, once in the morning and again prior to the incident.

3. Nami testified that he smoked 2 bowls of Chronic, which he described as 'high grade marijuana.'

4. Nami was at Carlos Guerrero's house and that it was 'light out' around 5 p.m.

5. Nami had not before seen the individuals that shot his brother before the incident.

6. Nami described the individual who shot his brother saying, 'I don't remember how he looked . . . thug looking . . . light clothing . . . may [sic] age . . . might have seen them wearing hats.'

7. Nami struggled over the firearm with the passenger of the fleeing vehicle.

8. After providing the appropriate admonishments, Detective Flores showed Nami a photo line-up at the police station.

9. On the admonishment form, Detective Flores crossed out the word 'not' on the form from the statement, 'I do not know the identity of the subject,' because he did know the identity of the suspect.

10. Nami first identified as the shooter the person in the bottom left spot of the lineup (ID# 1341662).

11. After continued conversation, Nami identified Defendant George Frank Diamos (ID# 1733549).

The trial court then concluded that while Nami had an adequate opportunity to observe the incident and he had viewed the photo lineup within twelve hours of the incident, he was impaired by his use of marijuana during and immediately before the shooting and his description of the suspect was "very general and broad." It found there was a substantial likelihood of irreparable misidentification of Diamos, and that the lineup procedure was impermissibly suggestive. The State contends the trial court generally believed the testimony of Nami and Detective Flores regarding the manner in which the lineup was administered. The State concludes that because both men testified the detective had not suggested Diamos's identity in any way, the trial court could not have found the procedure to have been impermissibly suggestive.

But a review of the trial court's findings suggests otherwise. While Nami claimed he did not intend to identify the first person he circled as the assailant but only wanted to notify the detective he had seen that person earlier, the trial court concluded that Nami had initially identified him as the shooter. Further, the court expressly disbelieved Nami's claim that the effects of the

9

marijuana had worn off by the time of the shooting and also found that Nami had made his second selection from the lineup only after "continued conversation" with Detective Flores. Most importantly, when the trial court's conclusion is based on an evaluation of credibility and demeanor—as when it concludes the lineup procedure was impermissibly suggestive based on the testimony of the witnesses—we are required to afford that conclusion almost total deference and assume that the court made implicit findings of fact buttressing the conclusion. *Ross*, 32 S.W.3d at 857; *Guzman*, 955 S.W.2d at 89. In concluding the lineup was impermissibly suggestive, the trial court implicitly rejected Nami and Detective Flores's assertions that the detective's administration of the lineup was not suggestive, a conclusion supported by the trial court's finding that Nami changed his selection only after "continued conversation" with Detective Flores. Nami and Detective Flores also testified that Flores informed Nami he knew who the suspect was. A procedure can be improperly suggestive where the police suggest to the witness the identity of the suspect or that a suspect is included in the lineup. *Barley*, 906 S.W.2d at 33. Accordingly, contrary to the State's contention, there was sufficient indicia of suggestiveness for the trial court to conclude the procedure was improperly suggestive.

Having found the procedure suggestive, the trial court was required to consider whether, under the totality of the circumstances, the procedure was so suggestive as to present a very substantial likelihood for irreparable misidentification. *Ibarra*, 11 S.W.3d at 196. Applying the *Biggers* factors, the court concluded: (1) Nami had an adequate opportunity to view the criminal act; (2) his attention was impaired by his use of "high grade" marijuana an hour before the incident; (3) Nami's description of the suspect was "very general and broad;" (4) he initially selected a suspect other than Diamos as the shooter but then asserted he was certain it was Diamos; and (5)

10

the confrontation occurred within twelve hours of the incident. Weighing these factors against the corrupting effect of the identification procedures, the trial court could have concluded that while factors one and five favored admission, Nami's attention impairment, his vague description of the suspect, and his initial identification of a person other than Diamos in the lineup created a substantial likelihood of irreparable misidentification. *Barley*, 906 S.W.2d at 34–35. Giving almost total deference to the trial court's conclusion—based on its evaluation of the witnesses' credibility—we cannot conclude the trial court abused its discretion in granting Diamos's motion to suppress. Accordingly, the State's sole issue is overruled.

## CONCLUSION

Having overruled the State's only issue, the decision of the trial court is affirmed.


November 9, 2018

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

11